John D. WILLIAMSON et al., Plaintiffs–
Appellants, Cross–Appellees,

v.

Gordon G. TUCKER et al., Defendants–
Appellees, Cross–Appellants.

No. 79–1058.

United States Court of Appeals,
Fifth Circuit.

Dec. 11, 1980.

E. Eldridge Goins, Jr., Dallas, Tex., for plaintiffs–appellants, cross–appellees.

Howard V. Tygrett, Jr., Dallas, Tex., for Godwin.

Gordon H. Rowe, Jr., Dallas, Tex., for Trustees, et al.

Stan McMurry, Dallas, Tex., for Gordon Tucker.

Ronald G. Houdyshell, Robert B. Payne, Dallas, Tex., for Fred Tucker.

E. Glen Johnson, Dallas, Tex., for Mason, Polan & M. L. Godwin Investments, Inc.

David P. Seikel, Houston, Tex., for Ken Good & Good Finance.

Before GODBOLD, GARZA and RANDALL, Circuit Judges.

582

RANDALL, Circuit Judge:

This case involves the application of the Securities Act of 1933 (the 1933 Act) and the Securities Exchange Act of 1934 (the 1934 Act) to a series of transactions in which undivided interests in a parcel of undeveloped real estate were transferred to several joint ventures created for the purpose of holding the interests for a small number of purchasers, in exchange for promissory notes from the purchasers to the original owners of the property. This suit was brought by four of the purchasers, seeking to rescind the joint venture agreements, cancel the notes they had signed, and recover money already paid on the notes. The plaintiffs predicated their federal cause of action on the applicability of the 1933 Act and the 1934 Act, arguing that both the joint venture interests and the notes issued in payment for the real estate are securities within the meaning of the 1933 Act and the 1934 Act. The district court dismissed their claims for lack of subject matter jurisdiction and awarded $18,-885.75 in costs to the defendants. We conclude that the plaintiffs' claims could not properly be dismissed for lack of subject matter jurisdiction; we therefore reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

I. THE FACTS

From 1960 to 1969, Gordon G. Tucker, Fred E. Tucker, Jr. and Marvin M. Blakeney, Jr. each owned an undivided one–third interest in a 160 acre tract of land located between Dallas and Fort Worth (the Property). Gordon Tucker and Fred Tucker are brothers; Blakeney, now deceased and not a party to this suit, was married to their sister. After the location of the Dallas–Fort Worth airport was announced, each of the Tucker brothers and Blakeney, in a separate transaction, sold his undivided interest in the Property. The first sale occurred in November, 1969, when Blakeney sold his undivided one–third interest to Kenneth M. Good and Associates, Trustee (Good & Associates).

The second sale (and the first transaction directly involved in this suit) occurred in May, 1970, when Fred Tucker sold his undivided one–third interest to a group composed of M. L. Godwin, L. R. Polan, Jr. and James F. Mason, all of whom are employees of M. L. Godwin Investments, Inc. (Godwin Investments). Although the contract of sale required the group to execute a promissory note in the principal sum of $1,000,000 to Fred Tucker, it permitted the group thereafter to form a joint venture, and if such was accomplished, to substitute a new note executed by all the joint venturers in lieu of, and in rearrangement of, the first note. In July, 1970, the Grapevine–Regional Airport No. 1 Joint Venture (Reg Air I) was executed by John D. Williamson (one of the four plaintiffs in this action) and fifteen other investors (none of whom is a party to this action) for the purpose of purchasing the interest that Godwin, Polan and Mason had purchased from Fred Tucker. In December, 1970, this interest was conveyed to Reg Air I, and a promissory note in the principal amount of $1,000,000 was executed and delivered by Williamson and the other joint venturers to Fred Tucker in renewal and extension of the original note. Williamson purchased a 20% interest in the venture.

In December, 1970, Gordon Tucker (still the owner of a one–third undivided interest in the Property) and Good & Associates (which had purchased Blakeney's one–third interest in the Property) each sold a one–sixth undivided interest in the Property (a total one–third undivided interest) to Grapevine–Regional Airport No. 2 Joint Venture (Reg Air II), a joint venture formed for the purpose of acquiring that interest. In consideration of the transfer, the joint venturers executed and delivered long–term promissory notes to Gordon Tucker and Good & Associates in the aggregate principal amount of $1,332,333. Williamson purchased a 20% interest in Reg Air II; Harold R. Lilley purchased a 10% interest; Joseph C. Wilson and George Blake each purchased a 5% interest. Lilley, Wilson and Blake are the other three plaintiffs in this action.

In June, 1971, Gordon Tucker and Good & Associates again each sold a one–sixth undivided interest in the Property. This time the purchaser was Grapevine–Regional Airport No. 4 Joint Venture (Reg Air IV), and the purchase price was paid by the execution and delivery to Gordon Tucker and Good & Associates by the joint venturers of long–term promissory notes totalling $1,500,000 in principal amount. Williamson again purchased a 20% interest; Lilley purchased a 10% interest.

As of June, 1971, therefore, each of three separate joint ventures owned an undivided one–third interest in the Property. The ownership of each joint venture was different; each had acquired its interest at a different time; and each had paid a different consideration. Nevertheless, the transactions were all arranged by Godwin Investments and are identical in all other relevant respects. Each of the purchases was financed by the execution and delivery of a fifteen year general liability promissory note, bearing interest at rates varying from 7% to 8½% per annum, with interest only payable for the first eight years. The liability of the venturers on each note was several and not joint. Each of the notes was secured by a vendor's lien and deed of trust covering the undivided one–third interest in the Property purchased in exchange for such note. Each of the joint ventures had approximately fifteen venturers. In each case Godwin Investments (or Godwin, Polan and Mason, employees of Godwin Investments) signed a contract to purchase an interest in the Property and then attracted potential investors to participate in a joint venture through materials describing the investment potential of the proposed venture and the expertise of God-win Investments, which was to manage the Property.[1]

These materials emphasized the strategic location of the Property and included an analysis of real estate values in the areas surrounding the Los Angeles, San Francisco and Atlanta airports. The analysis stated, for example:

Although the comprehensive data listed herein would not be totally analagous to each given situation affecting the Dallas/Fort Worth Regional Airport, we do feel that the historical development of other major airport areas would indicate a similar potential use and value pattern applicable to the Regional Airport. Of course, an international airport of this immense size will undoubtedly have a tremendous effect on the values and development of nearby land, and its eventual economic contribution might be far greater than the public's ability to presently comprehend!

It was expected that the Property would be held by the joint venturers for a period of substantial appreciation in real estate values, after which it would be either be sold by the venturers or developed by them. Godwin Investments represented that it would ultimately pursue the sale or development of the Property and in the interim would perform all management duties, including efforts to have the land rezoned from single–family residential to its best uses. As the materials emphasized:

OUR FIRM AGGRESSIVELY PURSUES ALL ZONING AND PROPER LAND PLANNING EFFORTS TO ASSURE THE MAXIMUM PROFIT POTENTIAL OF EACH INVESTMENT.

Despite the representations of Godwin Investment's management duties and capabil-

---

1. Reg Air II and Reg Air IV purchased their interests directly from the original owners (Gordon Tucker and Good & Associates), as Godwin Investments assigned its contract of sale to them before the closing date. Reg Air I purchased its interest from Godwin Investments, however, which had already closed its purchase from Fred Tucker. There has been much discussion on the nature of the relationship between the purchasers of joint venture interests and the original owners of the Property, and Fred Tucker argues that the two–step process through which his interest was transferred to the purchasers insulates him from securities liability. This issue would be relevant in a trial reaching the merits of this case; but the dismissal now at issue was for lack of subject matter jurisdiction and appears to have been based solely on the exclusion of the joint venture interests and the promissory notes from the definition of securities in the federal securities acts.

ities, the participants in each joint venture retained substantial control of the venture in the agreement which they signed. Each joint venture agreement requires unanimous consent of the venturers to confess a judgment; to make, execute or deliver any bond, mortgage, deed of trust, guarantee, indemnity bond, surety bond or accommodation paper or accommodation endorsement; to borrow money in the name of the joint venture or use joint venture property as collateral; and to amend the agreement to modify the rights of the venturers. In the event that any proposal for development is presented to the venturers, the vote of the holders of 60% or 70% in joint venture interests (depending upon the particular joint venture involved) is required for its approval. If the proposal is accepted, those venturers who approve it are obligated to purchase the interests of those who do not. Whether the Property is developed or not, the venturers have the power—by vote of 60% or 70% in interest, as the case may be—to remove Godwin Investments as manager and to make any other decision regarding the Property.

The extent to which the joint venturers actually exercised these powers is not clear. All of the plaintiffs herein represent that they relied entirely on Godwin Investments and made no attempt to oversee or participate in the management of the Property, at least until late 1975. It appears that several other venturers defaulted in their payments in 1975, and that two other venturers (who are not plaintiffs herein) threatened suit against some of the defendants herein in 1976, at which time the plaintiffs represent they first became aware of alleged securities violations. The record shows that—apparently because of these events—all of the plaintiffs participated in joint venture meetings (although the number of meetings and the nature of the participation is unclear) after late 1975.

In 1976, the plaintiffs defaulted in their payments under the notes they had executed. In June 1977, the trustees under the deeds of trust securing the payment of the plaintiffs' notes to Fred Tucker, Gordon Tucker and the Trustees of the Home Inte-

riors and Gifts Profit Sharing Trust (who purchased the notes executed by the venturers in Reg Air II and Reg Air IV payable to Good & Associates) foreclosed and sold the plaintiffs' undivided interests in the Property. The sale proceeds did not fully cover the plaintiffs' obligations.

## II. THE PROCEDURAL POSTURE OF THIS CASE

On June 29, 1976, the plaintiffs—Williamson, Lilley, Wilson and Blake—filed suit in the United States District Court for the Northern District of Texas, seeking to rescind the joint venture agreements they had signed and cancel the notes they had executed, and to recover the amounts they had already paid on the notes, plus interest and attorneys' fees. The complaint, as amended, asserts claims based upon the 1933 Act, the 1934 Act, the Texas Securities Act and common law omissions and misrepresentations against Godwin Investments (the manager of the Property), Fred Tucker, Gordon Tucker and Good & Associates (the original owners of the Property), and persons who in the past or now own notes executed and delivered by the plaintiffs in payment for the Property. Counterclaims were filed by the present holders of the notes to collect deficiencies allegedly owed by the plaintiffs following foreclosure sales of the plaintiffs' undivided interests in the Property.

In March and April, 1978, each of the defendants filed a motion for summary judgment, Fed.R.Civ.P. 56, or a motion to dismiss for lack of subject matter jurisdiction, Fed.R.Civ.P. 12(b)(1). The plaintiffs based their claim—and consequently federal jurisdiction—on the inclusion of both the joint venture interests they purchased and the notes they executed within the definition of "security" in section 2(1) of the 1933 Act, 15 U.S.C. § 77b(1) (1976), and section 3(a)(10) of the 1934 Act, 15 U.S.C. § 78c(a)(10). After extensive discovery, all parties filed briefs and the court heard oral argument on the motions. On December 19, 1978, the district court dismissed this entire suit. The judgment of the court was as follows:

IT IS ORDERED, ADJUDGED and DE-CREED that Plaintiffs' actions be, and they are hereby, dismissed for want of subject matter jurisdiction; that, because of such dismissal of Plaintiffs' actions, all counterclaims and cross–actions are hereby dismissed without prejudice for want of jurisdiction; and that Defendants recover of the Plaintiffs their costs of action.

The district court did not set forth in the judgment any reasons for its decision. The court did, however, send a letter to all counsel briefly explaining the decision:

> I have heard your argument, reviewed the record and your briefs and concluded that the joint venture agreements were not securities. *Securities and Exchange Commission v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). Also, I have concluded that the notes made by the Plaintiffs are commercial in nature, not investments, in light of the reasoning of the Fifth Circuit in the line of cases culminating in *National Bank of Commerce v. All American Assurance Company* [583 F.2d 1295] No. 76–3331 (5th Cir. Nov. 14, 1978).

> I am therefore of the opinion that I have no jurisdiction in this case and that it must be dismissed.

To say the least, this letter from the district judge is a short and ambiguous statement of the basis of his decision. The brevity of his explanation is all the more striking in the face of the complexity of the facts and issues necessarily involved in the decision; this case comes to us with over 3,000 pages of record in fourteen volumes, more than fifty volumes of depositions, and briefs from six separate parties.

In failing to state findings of fact and conclusions of law, the district court presumably relied on the final sentence of Fed. R.Civ.P. 42(a), which states that such findings are unnecessary "on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(b)." [2] Some courts have indeed read this provision to exempt all decisions under the stated rules from the requirement of findings. *E. g., Lea v. Cone Mills Corp.*, 467 F.2d 277 (4th Cir. 1972); *Robin Products Co. v. Tomecek*, 465 F.2d 1193 (6th Cir. 1972); *Interpace Corp. v. City of Philadelphia*, 438 F.2d 401 (3rd Cir. 1971). But one commentator has argued that it would be more consistent with the purpose of Rule 52(a) (and with

2. Fed.R.Civ.P. 52(a) provides:

*Effect.* In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(b).

Fed.R.Civ.P. 41(b) provides:

*Involuntary Dismissal: Effect Thereof.* For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against him. After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a). Unless the court in its order for dismissal under this subdivision otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits.

the intent of the Advisory Committee on Rules, which drafted the final sentence of the Rule) to read the Rule as a whole to require findings of fact whenever a decision rests on factual determinations. 5A J. Moore, *Moore's Federal Practice* ¶ 25.08 (1980). *See Horizons Titanium Corp. v. Norton Co.*, 290 F.2d 421 (1st Cir. 1961); *Interpace Corp. v. City of Philadelphia, supra* (dissent).[3] We need not decide whether the district courts are required to make findings of fact whenever a decision of a motion is based on a factual determination, for we find *infra* that the record cannot be construed in any way so as to support the action taken by the district court in this case. We do emphasize, however, that an explanation of the basis of the district court's decision can be invaluable even in cases where Rule 52(a) clearly does not require findings of fact.[4] A motion which is based purely on the pleadings and on undisputed facts sometimes implicates complicated factual and legal issues, or rests on a lengthy and difficult record. We have repeatedly stated that a detailed statement of the reasons for such a decision would be most helpful to appellate review. *Huckeby v. Frozen Food Express*, 555 F.2d 542, 545 n.4 (5th Cir. 1977); *Melancon v. Insurance*

*Co. of North America*, 482 F.2d 1057, 1059 n.4 (5th Cir. 1973); *Steed v. Central Georgia Railway Co.*, 477 F.2d 1303, 1305 (5th Cir. 1973); *United States ex rel. Industrial Investment Corp. v. Paul Hardeman, Inc.*, 320 F.2d 115, 116 (5th Cir. 1963).

In this case it is not clear what action the district court took or whether it based its decision on a resolution of disputed factual issues. Several important statements are missing from the district court's order and letter of explanation. First, the order is not explicitly entered under either Rule 12(b)(1) or Rule 56, the two separate motions before the court. Second, it is not entirely clear whether the court based its decision on the face of the plaintiffs' complaint or instead relied on facts presented in the record, and if the latter, whether it relied only on undisputed facts or in addition made certain factual determinations. The judge's letter does state that he "reviewed the record;" but to the extent that this means that the court relied on facts not stated in the complaint, it is not clear whether the court based its decision purely on undisputed facts or instead made some factual determination on the basis of conflicting depositions, affidavits and documents. And third, the district court did not

3. The findings required by Fed.R.Civ.P. 52(a) serve three important purposes: they aid the appellate court by helping it to understand the basis of the trial court's decision; they clarify the precise issues which are decided by the court, in order to allow the doctrines of collateral estoppel and res judicata to operate in future cases; and they insure care on the part of the trial judge in ascertaining the facts. *See* 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2571, at 679–90 (1971); 5A *Moore's Federal Practice* ¶ 52.06(1) (1980). All three of these purposes are served whenever the district court makes a decision on the basis of factual determinations, even when that decision is on a motion under Rule 12. Most courts before 1946 therefore held that findings of fact were required on decisions of motions which rested on factual determinations, *i. e.*, motions under Rule 12 which were based on disputed facts, although findings need not be made on decisions of motions which did not rest on factual determinations, *i. e.*, motions for summary judgment, Rule 56, and motions directed at the pleadings under Rule 12. *See* 4 *Federal Rules Digest* 52a.1 (2d ed. 1955). The final sentence of Rule 52(a) was added to the rule in

1946. The Notes of the Advisory Committee on 1946 Amendments to the Rules indicate that its purpose was to incorporate existing judicial interpretations into the rule. *See* Fed.R.Civ.P. 52(a), 28 U.S.C.A. at 18 (1971); Fed.R.Civ.P. 41(b), 28 U.S.C.A. at 335 (1971). Moreover, although we have not specifically required Rule 52(a) findings for decisions on motions under Rule 12, we have required them for decisions on motions to hold a party in civil contempt (which also fall within the final sentence of Rule 52(a)). *Sanders v. Monsanto Co.*, 574 F.2d 198 (5th Cir. 1978).

4. In *Huckeby v. Frozen Food Express*, 555 F.2d 542, 545 n.4 (5th Cir. 1977), we stated that findings of fact are not required in decisions of motions under the rules mentioned in the final sentence of Rule 52(a). But there were no disputed facts in *Huckeby*, and therefore the court did not decide whether the requirement attaches to decisions which are based on factual determinations. In any case it is clear that findings are not required where a motion is based purely on the pleadings and on undisputed facts.

state the standard by which it decided the motions before it. All of this makes our task a good deal more difficult. Before reaching the validity of the district court's judgment, we must first determine (1) the action which it took (that is, precisely which motion it granted); (2) the factual basis of the decision; and (3) the standard which is appropriate to the action taken.

## The Action Taken by the District Court

A motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and a motion for summary judgment under Rule 56 were both properly before the district court. Although Rule 56 requires that a motion for summary judgment be filed at least ten days before a hearing on it and that the opposing party have the opportunity to present affidavits in opposition, it appears that these requisites were met; the Rule 56 motions were filed months before the hearing and were met with extensive discovery and affidavits from a number of parties. Moreover, the record in the case and the arguments made to the court could conceivably have formed the basis of either motion; the applicability of the 1933 Act and the 1934 Act to the transactions at issue is the basis of both federal jurisdiction and the merits of the plaintiffs' cause of action.

It is arguable—on the basis of the record in this case and the arguments made to the district court—that the trial judge intended to enter an order for summary judgment, and we note that we are not bound by the label the district court puts on its action where *underlying* facts indicate that a different action was in fact intended. *Tuley v. Heyd,* 482 F.2d 590 (5th Cir. 1973). Nevertheless we believe that the order in this case must be considered as the granting of a motion to dismiss for lack of subject matter jurisdiction, Rule 12(b)(1). The order of the district court states that the

action is "dismissed for want of subject matter jurisdiction" and dismisses all counter-claims and cross-actions "without prejudice for want of jurisdiction." The letter from the district judge concludes that he is "of the opinion that I have no jurisdiction in this case and that it must be dismissed." On this basis it seems clear that the judge did not intend to rule on the merits of the plaintiffs' claims. Given the judge's consistent reference to the lack of subject matter jurisdiction, a stronger showing of a different intent would have to be shown before we could recharacterize the action of the district court.

## The Factual Basis of the District Court's Decision

A motion to dismiss for lack of subject matter jurisdiction, Rule 12(b)(1), can be based on the lack of jurisdiction on the face of the complaint. If so, the plaintiff is left with safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised—the court must consider the allegations in the plaintiff's complaint as true. *E.g., Spector v. L Q Motor Inns, Inc.,* 517 F.2d 278, 281 (5th Cir. 1975); *Herpich v. Wallace,* 430 F.2d 792, 802 (5th Cir. 1970). But the two motions are treated quite differently when matter outside the complaint is the basis of the attack. Rule 12(b) provides that a motion to dismiss for failure to state a claim will be automatically converted into a motion for summary judgment (Rule 56) if the court considers matters outside the pleadings.[5] This provides an additional safeguard for the plaintiff, for, in addition to having all his allegations taken as true, the trial court cannot grant the motion unless there is no genuine issue of material fact. This protection is not, however, provided the plaintiff who faces dismissal for lack of subject matter jurisdiction. As the Court of Appeals for the Third Circuit has explained:

> the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

---

5. The relevant portion of Rule 12(b) provides:
 If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court,

The facial attack [on subject matter jurisdiction] does offer similar safeguards to the plaintiff: the court must consider the allegations of the complaint as true. The factual attack, however, differs greatly for here the trial court may proceed as it never could under 12(b)(6) or Fed.R.Civ.P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

*Mortensen v. First Federal Savings and Loan Association*, 549 F.2d 884, 891 (3rd Cir. 1977). The distinction between factual Rule 12(b)(1) motions and factual Rule 12(b)(6) motions is rooted in the unique nature of the jurisdictional question. It is elementary that a district court has broader power to decide its own right to hear the case than it has when the merits of the case are reached. Jurisdictional issues are for the court—not a jury—to decide, whether they hinge on legal or factual determinations. *See* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1350 (1969). The unique power of district courts to make factual findings which are decisive of jurisdiction is, therefore, not disputed. *Land v. Dollar*, 330 U.S. 731, 735 n.4, 67 S.Ct. 1009, 1011 n.4, 91 L.Ed. 1209 (1947); *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507 (5th Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. ——, 66 L.Ed.2d 217 (1980); *Thornhill Publishing Co., Inc. v. General Telephone & Electronics Corp.*, 594 F.2d 730 (9th Cir. 1979); *McLain v. Real Estate Board of New Orleans, Inc.*, 583 F.2d 1315 (5th Cir. 1978), *vacated on other grounds,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980); *Mortensen v. First Federal Savings and Loan Association, supra; Exchange National Bank of Chicago v. Touche Ross &*

*Co.*, 544 F.2d 1126 (2d Cir. 1976); *State of Alabama ex rel. Baxley v. Woody*, 473 F.2d 10 (5th Cir. 1973); *Rosemound Sand and Gravel Co. v. Lambert Sand and Gravel Co.*, 469 F.2d 416 (5th Cir. 1972). This means that the district court is not limited to an inquiry into *undisputed* facts. It may hear conflicting written and oral evidence and decide for itself the factual issues which determine jurisdiction. Thus, in *Menchaca v. Chrysler Credit Corp., supra*, we upheld a dismissal for lack of subject matter jurisdiction which was based in part on the district court's determination—on the basis of a written record and the testimony of all parties—of factual issues that were in dispute.

■ The district court consequently has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.

Which of these is the foundation of the district court's decision is relevant to appellate review in several ways. First, if the court's decision rests on one of the first two of these bases—in which case the court need not decide among conflicting factual positions—our review is limited to determining whether the district court's application of the law is correct and, if the decision is based on undisputed facts, whether those facts are indeed undisputed. But if the court has relied in addition on its own determination of disputed factual issues, we must then review those findings as we would any other district court resolution of factual disputes—we must accept the district court's findings unless they are "clearly erroneous." *McLain v. Real Estate Board of New Orleans, Inc., supra* at 1322–23; *Krashov v. Dinan*, 465 F.2d 1298 (3rd Cir. 1972); *Walden v. Broce Construction Co.*, 357 F.2d 242 (10th Cir. 1966); *Hill v. Gregory*, 241 F.2d 612 (7th Cir. 1957).[6]

**6.** Where the attack on jurisdiction implicates the merits of the plaintiff's federal cause of

action, the district court's role in judging the facts may be more limited and our role in

Second, if the district court bases its decision on its own resolution of disputed facts it may be required, at the very least, to identify and explain the factual determinations it has made.

█ Third, the path which the district court takes to its jurisdictional decision can limit its procedural discretion. It is true that the factual determinations decisive of a motion to dismiss for lack of jurisdiction are within the court's power, and that no right to a jury trial exists with regard to such issues. *Menchaca v. Chrysler Credit Corp., supra,* 101 S.Ct. at 511; *Rosemound Sand and Gravel Co. v. Lambert Sand and Gravel Co., supra* at 418. But still the district court must give the plaintiff an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss. Thus, some courts have refused to grant such a motion before a plaintiff has had a chance to discover the facts necessary to establish jurisdiction. *Surpitski v. Hughes–Keenan Corp.,* 362 F.2d 254 (1st Cir. 1966); *Collins v. New York Central System,* 327 F.2d 880 (D.C. Cir. 1963). Other courts have refused to uphold such a motion where–absent an incurable defect in the complaint–the plaintiff has had no opportunity to be heard on the factual matters underlying jurisdiction. *Harmon v. Superior Court of State of California in and for the County of Los Angeles,* 307 F.2d 796 (9th Cir. 1962); *Topping v. Fry,* 147 F.2d 715 (7th Cir. 1945). And, although Fed.R. Civ.P. 43(e) allows factual motions to be heard on the basis of affidavits alone,[7] a judge may be required to hear oral testimony where the facts are complicated and testimony would be helpful. As we ex-

plained in *Sanders v. Monsanto Co., supra* at 200 (holding, *inter alia,* that a civil contempt motion cannot be decided under Rule 43(e)):

> Historical experience has taught us that testimonial evidence has the highest reliability because the credibility of the witness can be evaluated, and the factual issues narrowed by cross–examination. Because the contempt proceedings depend so heavily on complex facts not readily perceivable from the record, an oral hearing within the scope of Rule 43(a) is necessary.

Insofar as the defendant's motion to dismiss raises factual issues, the plaintiff should have an opportunity to develop and argue the facts in a manner that is adequate in the context of the disputed issues and evidence.

For all of these reasons it is important–and sometimes crucial–that the district court state the basis (including any factual determinations made) of a decision to dismiss for lack of subject matter jurisdiction. In the absence of such a statement, an appellate court can decide the appeal only with great difficulty and only in two limited circumstances. First, an appellate court may determine for itself, on the basis of the record and any statements made by the district court, what the basis of the district court's decision was and what, if any, implicit factual findings it made. On a record as long and as complicated as the one in this case, such an attempt would be little more than guesswork and we decline to engage in such guesswork. Second, an appellate court may reverse a decision of the district court dismissing a case for lack of subject matter

---

reviewing the court's findings may be somewhat greater. Thus, the "clearly erroneous" standard of review may not be applicable in all such cases. *See infra* note 10 & accompanying text.

**7.** Fed.R.Civ.P. 43 deals with the taking of testimony. In pertinent part, it provides:

(a) *Form.* In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by an Act of Con-

gress or by these rules, the Federal Rules of Evidence, or other rules adopted by the Supreme Court.

. . . . .

(e) *Evidence on Motions.* When a motion is based on facts not appearing of record the court may hear the matter on affidavits presented by the respective parties, but the court may direct that the matter be heard wholly or partly on oral testimony or deposition.

jurisdiction if it finds that the record cannot be construed in any way so as to support such a dismissal.[8] *See Horizons Titanium Corp. v. Norton Co., supra* at 424. On the basis of our discussion below, we conclude that this is an appropriate way to resolve this case. For the purpose of this analysis, we will assume that any disputed material facts were decided by the district court in favor of its action. Any decisions as to disputed material facts which must have been made by the district court will be discussed in greater detail below, following our analysis of the basic legal issues involved in this case.

### The Standard by Which This Motion to Dismiss for Lack of Subject Matter Jurisdiction Should be Decided

 The Supreme Court has enunciated a strict standard for dismissals for lack of subject matter jurisdiction when the basis of jurisdiction is also an element in the plaintiff's federal cause of action. In *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1945) (implied right of action under the Fourth and Fifth Amendments), the Court explained:

> Jurisdiction, therefore, is not defeated as respondents seem to contend, by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as questions of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its

jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction. . . . *The previously carved out exceptions are that a suit may sometimes be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.* The accuracy of calling these dismissals jurisdictional has been questioned.

327 U.S. at 682, 66 S.Ct. at 776 (emphasis added). *Accord, Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974); *Powell v. McCormack*, 395 U.S. 486, 512–16, 89 S.Ct. 1944, 1959–61, 23 L.Ed.2d 491 (1969); *Baker v. Carr*, 369 U.S. 186, 198–204, 82 S.Ct. 691, 699–703, 7 L.Ed.2d 663 (1962). Where the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court (assuming that the plaintiff's federal claim is not immaterial and made solely for the purpose of obtaining federal jurisdiction and is not insubstantial and frivolous) is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case.[9] The Supreme Court has made it clear that in that situation no purpose is served by indirectly arguing the merits in the context of federal jurisdiction. Judicial economy is best promoted when the existence of a federal right is directly reached and, where no claim is

---

8. Conversely, were an appellate court to find that dismissal for lack of subject matter jurisdiction would be appropriate if disputed factual issues had been resolved by the district court in a particular way, and the district court had failed to explain its resolution of such factual issues, then the appellate court would have to remand for such an explanation before it could exercise its appellate function.

9. Conversely, a jurisdictional attack which does *not* implicate the merits of any federal cause of action is not bound by the strict *Bell v. Hood* standard. A district court may find, for example, that the basis for diversity jurisdiction is absent without finding that the underlying state claim is "immaterial" or "insubstantial."

found to exist, the case is dismissed on the merits. This refusal to treat indirect attacks on the merits as Rule 12(b)(1) motions provides, moreover, a greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim: the defendant is forced to proceed under Rule 12(b)(6) (for failure to state a claim upon which relief can be granted) or Rule 56 (summary judgment)—both of which place greater restrictions on the district court's discretion. The court must take the plaintiff's allegations as true when a Rule 12(b)(6) motion is raised, and in addition must determine that no genuine issue of material fact exists when a Rule 56 motion is granted. As discussed above, however, a Rule 12(b)(1) motion can be based on the court's resolution of disputed facts as well as on the plaintiff's allegations and undisputed facts in the record. Therefore as a general rule a claim cannot be dismissed for lack of subject matter jurisdiction because of the absence of a federal cause of action. The exceptions to this rule are narrowly drawn, and are intended to allow jurisdictional dismissals only in those cases where the federal claim is clearly immaterial or insubstantial. As we stated in *Bell v. Health–Mor, Inc.*, 529 F.2d 342 (5th Cir. 1977), the *Bell v. Hood* standard is met only where the plaintiff's claim "has no plausible foundation" or "is clearly foreclosed by a prior Supreme Court decision."[10]

■ The question in this case is whether certain joint venture interests and certain promissory notes are "securities" within the meaning of the 1933 Act and the 1934 Act. We have already specifically held that the definition of the term "security" in the context of a suit based on the federal securities laws may reach the merits of the case and thereby limit the court's discretion to dismiss for lack of subject matter jurisdiction. *Hilgeman v. National Insurance Co. of America*, 547 F.2d 298 (5th Cir. 1977) (whether certain insurance policies were securities); *Bell v. Health–Mor, Inc., supra* (whether a referral sales agreement is a security). In this case it is clear that the jurisdictional issue reaches the merits of the plaintiffs' case; if the joint venture interests and notes are not securities, there is not only no federal jurisdiction to hear the case but also no federal cause of action on the stated facts.

If this case was properly dismissed for lack of subject matter jurisdiction, it must therefore fall within the exceptions to *Bell v. Hood*'s general prohibition of jurisdictional dismissals which implicate the merits of the plaintiffs' case. That is, the plaintiffs' claim must "clearly appear to be immaterial and made solely for the purpose of obtaining jurisdiction," or must be "wholly insubstantial and frivolous." In the discussion to follow we find (1) that the plaintiffs have a difficult factual burden if they are to establish that the joint venture interests they purchased are securities, and (2) that on the basis of undisputed facts the notes are not securities. We need not decide

---

**10.** This standard tests the *legal* sufficiency of the plaintiff's cause of action. But an attack on jurisdiction might challenge instead the *factual* basis of the plaintiff's claim. Where the defendant admits that a federal claim exists on facts stated in the complaint but argues that these facts cannot be established, the question arises whether these jurisdictional facts (which admittedly implicate the merits of the plaintiff's claim) must be accepted for jurisdictional *purposes* unless the evidence to support them is clearly insubstantial. One might argue that the *Bell v. Hood* reluctance to dismiss for lack of jurisdiction on the basis of arguments which go to the merits of the case is relevant whether the jurisdictional attack is legal or factual. But in *McLain v. Real Estate Board of New Orleans, Inc., supra* at 1322–23, we held that where the jurisdictional issue can be extricated from the merits and tried as a separate issue the findings of the district court must be accepted unless they are clearly erroneous. *See also Menchaca v. Chrysler Credit Corp., supra* (accepting the findings of the district court, but not discussing the appropriate standard). This holding indicates that at least in some circumstances the standards are not the same for legal and factual attacks on jurisdiction which implicate the merits. But *McLain* did not deal with factual findings in cases where the jurisdictional issue *is* so intertwined with the merits that it cannot be separately addressed, and did not consider the appropriate standard for the district court's evaluation of the evidence. We need not reach these issues today, for we find that a dismissal for lack of jurisdiction was improper even if all disputed material facts are resolved against the plaintiffs.

whether the plaintiffs' assertion that the notes are securities is so immaterial or insubstantial as to allow a dismissal for lack of jurisdiction, for the plaintiffs' assertion that the *joint venture interests* are securities is clearly not so immaterial or insubstantial. Even assuming that the district court found disputed material facts against the plaintiffs, we cannot say that their argument "has no plausible foundation" or "is clearly foreclosed by a prior Supreme Court decision." If the answer in this case were that easy the substantive issues could have been resolved in an opinion a good deal shorter than this one. Therefore we must reverse the district court's order dismissing this case for lack of subject matter jurisdiction. However, the substantive issues presented by the district court's decision will remain to be disposed of by the district court. Therefore, in the interests of judicial economy, *see Bell v. Health–Mor, Inc.*, 549 F.2d at 345, we will discuss the substantive questions at issue in this case.

## III. THE JOINT VENTURE INTERESTS

The plaintiffs argue that their interests in the joint ventures were "investment contracts" and therefore "securities" within the definitions stated in section 2(1) of the 1933 Act, 15 U.S.C. § 77b(1), and in section 3(a)(10) of the 1934 Act, 15 U.S.C. § 78c(a)(10).[11] We must therefore begin where all analyses of investment contracts start, with *Securities & Exchange Commission v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) (appeal from a judgment denying an injunction sought by the S.E.C.). In *Howey* the Su-

preme Court held that an offering of individual rows of trees in a citrus grove development, coupled with a contract for cultivating and marketing the trees and remitting the net proceeds to the investor, was an offering of an "investment contract." The Court recognized that "something more than fee simple interests in land, something different from a farm or orchard coupled with management services" was needed to convert these sales of land into investment contracts. The Court found "something more" in the seller's plan to gather the plots together and manage them as one and in the dependence of the investors on that common enterprise. The seller explained to the investors that it was uneconomic to purchase the land without the management contract, and 85% of the land sold was so covered. Most investors were nonresidents and lacked the necessary knowledge, skill and equipment to care for the trees. The investors realized that they were part of a larger scheme, the success of which depended on the company's ability to manage a large grove. They were entirely dependent, therefore, on the efforts and abilities of the seller for any return on their investment. *See also Securities & Exchange Commission v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943) (sale of oil leases conditioned on promoter's agreement to drill exploratory well) (appeal from a judgment denying an injunction sought by the S.E.C.).

▪ In deciding *Howey* the Court defined an investment contract as follows:

In other words, an investment contract for purposes of the Securities Act means

---

11. Section 2(1) of the Securities Act of 1933 provides:

The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit sharing agreement, collateral trust certificate, preorganization certificate or subscription, transferable share, *investment contract*, voting–trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas or other mineral rights, or, in general, any interest or instrument commonly known as a "security" or any certificate of interest or participation in,

temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. Section 3(a)(10) of the Securities Exchange Act of 1934 corresponds almost exactly with this definition. It adds, however, an exception to the above:

[The term "security"] shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of a promoter or a third party.

328 U.S. at 298–99, 66 S.Ct. at 1102–1103. As this court has recognized, the test requires three distinct elements: (1) an investment of money; (2) in a common enterprise; and (3) on an expectation of profits to be derived solely from the efforts of individuals other than the investor. *Securities & Exchange Commission v. Koskot International, Inc.*, 497 F.2d 473 (5th Cir. 1974) (pyramid franchise scheme) (reversing a dismissal for failure to state a claim). The joint venture interests in this case involve the most often litigated of these factors–the expectation of "profits solely from the efforts of [others]."

Although the Court used the word "solely" in the *Howey* decision, it should not be interpreted in the most literal sense. The Supreme Court has repeatedly emphasized that economic reality is to govern over form and that the definitions of the various types of securities should not hinge on exact and literal tests. *International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 796, 58 L.Ed.2d 808 (1979); *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 848, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 (1975); *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); *Howey, supra*, 328 U.S. at 298, 66 S.Ct. at 1102.

A broad definition of "solely" was developed in *Securities & Exchange Commission v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973) (appeal from the granting of a preliminary injunction sought by the S.E.C.). There the Court of Appeals for the Ninth Circuit was faced with a pyramid franchise scheme which depended for its success on the efforts of the promoters (who were to actually sell the product, a series of motivational seminars called "Dare to be Great") but nevertheless required an effort on the part of the investors (who received a commission for new prospects brought to the promoters). Although profits were not strictly to come "solely" from the efforts of the promoters who gave the sales pitch and ran the program, the court held that the scheme was an investment contract:

> We hold, however, that in light of the remedial nature of the legislation, the statutory policy of affording broad protection to the public, and the Supreme Court's admonitions that the definition of securities should be a flexible one, the word "solely" should not be read as a strict or literal limitation on the definition of an investment contract, but rather must be construed realistically, so as to include within the definition those schemes which involve in substance, if not form, securities . . . .

> Strict interpretation of the requirement that profits to be earned must come "solely" from the efforts of others has been subject to criticism . . . . Adherence to such an interpretation could result in a mechanical, unduly restrictive view of what is and what is not an investment contract. It would be easy to evade by adding a requirement that the buyer contribute a modicum of effort. Thus the fact that the investors here were required to exert some efforts if a return were to be achieved should not automatically preclude a finding that [the scheme] is an investment contract. To do so would not serve the purpose of the legislation. *Rather we adopt a more realistic test, whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.*

474 F.2d at 482 (emphasis added).

This court was faced with an identical scheme (in fact, a subsidiary of Glenn W. Turner Enterprises) in *Securities and Exchange Commission v. Koskot International, Inc., supra*. After considering the historical derivation of the *Howey* standard and its development in recent years, we adopted the test explicated by the Ninth Circuit in

*Turner* and held the scheme to be an investment contract. 497 F.2d at 479–85. Moreover, the Supreme Court has altogether omitted the word "solely" in its most recent formulation of the investment contract definition. In *United Housing Foundation, Inc. v. Forman, supra* (holding that stock in a housing cooperative that entitled the owner to the use of an apartment, but not to any cash return, was not a security) (appeal from the granting of a motion to dismiss for lack of subject matter jurisdiction), the Court quoted the investment contract definition from *Howey* and restated it as "an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." 421 U.S. at 852, 95 S.Ct. at 2060.

The plaintiffs argue that they meet this liberalized form of the third prong of the *Howey* test by virtue of the significant role left to Godwin Investments in the promotional materials:

> The significance of the manager's efforts to the enterprise involved in this case are acknowledged by promotional sales materials and deposition testimony . . . . The managers were to plan uses for the property, obtain zoning changes, refinance, manage condemnation proceedings, and develop, lease or sell the property to return a profit.

Appellants' Brief 31. They argue that, since these central tasks were to be performed by the manager, the scheme allowed the investors to rely on others for "those essential managerial efforts which affect the failure or success of the enterprise," and, accordingly, that the venture interests were securities under *Howey* and its progeny. However, whether the role actually played by the plaintiffs in the management of the Property was so significant that their joint venture interests cannot be securities

is an issue that was not developed to any significant degree by any of the litigants in the district court. None of the affidavits or briefs in support of the defendants' motions under Rules 12(b)(1) and 56 discusses the extent of the plaintiffs' actual participation in the management of the Property.[12] Instead, the battle was joined over the question whether the powers possessed by the joint venturers in the joint venture agreements were so significant that, regardless of the degree to which such powers were exercised, the investments could not have been premised on a reasonable expectation of profits to be derived from the management efforts of others. The issue, then, as posed by the parties, is whether meaningful powers possessed by the venturers under the joint venture agreements are enough to preclude as a matter of law a finding that the venture interests were securities.

Although this issue has not previously arisen in the Fifth Circuit, a number of courts elsewhere have dealt with a variety of situations in which investors retained substantial control but in fact remained passive. The question has been faced in the context of franchise agreements, the sale of oil and gas leases, the sale of real estate, and the sale of partnership or joint venture interests. Insofar as the power retained by the investors is a real one which they are in fact capable of exercising, courts have uniformly refused to find securities in such cases.

In *Mr. Steak, Inc. v. River City Steak, Inc.,* 460 F.2d 666 (10th Cir. 1972), *affirming* 334 F.Supp. 640 (D.Colo.1970), the Court of Appeals for the Tenth Circuit affirmed a dismissal, for failure to state a claim, of alleged federal securities claims arising out of a franchise agreement which envisioned substantial operation by the franchisor but left some meaningful control in the hands of the franchisee. The agreement provided

---

**12.** Were there any indication that the district court had based its decision on the involvement of the plaintiffs in the operation of the Property, we might have found it necessary to remand this case to the district court for a statement of its factual determinations in this regard, for a finding of significant participation by the plain-

tiffs in the management of the venture might indeed provide the basis of motion to dismiss for lack of subject matter jurisdiction. But that issue was clearly not developed before the district court and we therefore need not reach it now.

that the franchisor (Mr. Steak) would construct and equip the establishment, train the manager, set a number of restrictions on the operation of the restaurant (including product standards, initial hiring, uniforms and the opening of the restaurant), manage the franchise's financial affairs and in fact retain the right to dismiss the manager for non–compliance with its requests. The franchisee (River City Steak) retained the right to direct the daily operation of the restaurant, and had the power to dismiss the manager and other employees. In fact, the franchisee exercised none of its powers and left the entire operation of the restaurant to the franchisor. Nevertheless, the district court–after adopting a liberal interpretation of the *Howey* standard–refused to find this arrangement a security:

> [The agreements] contemplated that River City Steak would play an active, if severely circumscribed, role in the conduct of the restaurant. It is also evident that neither a manager nor subsidiary personnel would be totally unresponsive to River City Steak, which had the power to terminate their employment. In fact, a reading of both contracts suggests to us that the role of the franchisee was envisioned as a flexible one, depending upon the business expertise and inclination of the franchisee. Most duties mentioned in the franchise agreement could be performed by the franchisee, or delegated to the manager. That River City Steak delegated performance of those duties and ignored daily operations does not affect the nature of its powers, nor change the essential fact that River City Steak abandoned what rights of control and participation it did have.

324 F.Supp. at 645, quoted at 460 F.2d at 669.

The Tenth Circuit has since been faced with a case analogous to *Mr. Steak, Inc.* but in the context of the sale of an oil and gas interest. In *Ballard & Cordell Corporation v. Zoller & Dannenberg Exploration, Ltd.*, 544 F.2d 1059 (10th Cir. 1976) (appeal from

the dismissal, for failure to state a claim, of counterclaims based on federal securities law), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1060 (1977), the defendants (two oil exploration firms) had offered to purchase a 50% working interest in two wells and lease units; after the plaintiffs accepted the offer, the defendants tried to back out, and the plaintiffs sued to enforce the contract. The defendants then asserted in a counterclaim that the transaction created an investment contract because of their dependence on the independent operator who held the lease.[13] No return was possible unless the operator chose to drill. But the court denied the existence of an investment contract, relying on terms in the operating agreement which gave the defendants considerable power over the operation. The agreement allowed them to withhold their consent for the incurrence of operating expenses over $5,000, for the drilling of new wells on the unit area, and for the reworking, plugging back or deepening of existing wells. In the event of disagreement, a dissenting party would be allowed not to participate in the proposed operation, and the defendants were also to participate in the selection of a new operator, should the present one sell his rights.

The Court of Appeals for the Eighth Circuit has twice faced the case of a purchaser of real estate who simultaneously with the purchase enters into a contract of management with the vendor, yet retains ultimate control of the operation. In *Fargo Partners v. Dain Corp.*, 540 F.2d 912 (8th Cir. 1976) (appeal from a dismissal for lack of subject matter jurisdiction), the plaintiff purchased a 248–unit apartment complex in a transaction in which it signed a management agreement granting back to the vendor an exclusive right to manage the property, including all of the marketing, renting, maintenance and financial activities attendant to running an apartment complex. The agreement provided, however, that it could be cancelled by the purchaser upon thirty days'

---

**13.** Subsequent to *Mr. Steak, Inc.* but prior to *Ballard & Cordell* the Tenth Circuit specifically adopted the wording of the *Turner* standard

which the Fifth Circuit, as discussed above, has adopted in *Koskot. Crowley v. Montgomery Ward & Co.*, 570 F.2d 875 (10th Cir. 1975).

notice. The court found that no investment contract was created by the transaction:

> We recognize that the statement in *Howey* that in an investment contract the investor relies *solely* on the efforts of the promoter or another is not taken as a literal requirement of the test.... Where the investors' duties were nominal or insignificant, their roles were perfunctory or ministerial, or they lacked any real control over the enterprise, the courts have found investment contracts.... It is clear, however, that Fargo's role was a significant one despite the management contract. Fargo retained ultimate control of the operation of the apartment complex by reserving the right to fire Candletree as its manager on thirty days' notice. Whether it chose to exercise that right or was content to give Candletree a free hand is irrelevant; the *power* to control the business was in Fargo's hands. *Mr. Steak, Inc. v. River City Steak, Inc.,* 460 F.2d 666, 670 (10th Cir. 1972).

540 F.2d at 914–15 (emphasis in original). The court came to the same conclusion when faced with a similar transaction involving some of the same parties but more seriously restricting the purchaser's right to change the management. In *Schultz v. Dain Corp.,* 568 F.2d 612 (8th Cir. 1978) (appeal from a dismissal for lack of subject matter jurisdiction), the apartment complex purchaser entered into a three–year non–revocable management contract with the vendors. Still the transaction did not create an investment contract. The purchaser had negotiated the contract himself and delegated his responsibility to an agent for a limited period of time, after which he was free to negotiate a new management arrangement. Therefore the investor had "retained ultimate control over the apartment complex" and had not purchased a security.

These cases from the Tenth and Eighth Circuits–dealing in turn with the purchase of franchise, oil and gas, and real estate interests–are consistent in their treatment of latent investor control. In each case the actual control exercised by the purchaser is irrelevant. So long as the investor has the right to control the asset he has purchased, he is not dependent on the promoter or on a third party for "those essential managerial efforts which affect the failure or success of the enterprise." But a complication is added where the investment asset is not owned directly, but is held instead through a joint venture or general partnership. While the partnership per se may have full ownership powers over the asset, each individual partner has only his proportionate vote in the partnership.

Nevertheless the courts that have ruled on the issue have held that a general partnership or joint venture interest generally cannot be an investment contract under the federal securities acts. In *New York Stock Exchange, Inc. v. Sloan,* 394 F.Supp. 1303 (S.D.N.Y. 1975), the District Court for the Southern District of New York granted summary judgment against general partners of a member firm who had brought a counterclaim against the New York Stock Exchange for failure to enforce the Exchange's rules. The court held that general partnerships were not securities, regardless of the actual participation of the partners:

> The fact that a partner may choose to delegate his day–to–day managerial responsibilities to a committee does not diminish in the least his legal right to a voice in partnership matters, nor his responsibility under state law for acts of the partnership.... These factors critically distinguish the status of a general partner from that of the purchaser of an investment contract who in law as well as in fact is a "passive" investor.

394 F.Supp. at 1314.

In *Hirsch v. duPont,* 396 F.Supp. 1214 (S.D.N.Y.), *aff'd,* 553 F.2d 750 (2d Cir. 1977), the District Court for the Southern District of New York again granted summary judgment on this issue. The plaintiffs were general partners of a brokerage firm which had been liquidated; its assets had been sold to a second brokerage firm, which as part of the deal agreed to sell general partnership interests in itself to

certain partners of the liquidated firm. The court followed its earlier reasoning in *Sloan* and held that the partnership interests were not securities. But the court added an important reason for its holding:

> [S]ome courts have stated that the reason *Howey* excluded the investor who participates in the enterprise from the protection of the disclosure and fraud provisions of the securities laws is that an investor does not need such protection where he obtains a degree of managerial control which affords access to information about the issuer. . . . The fact that the investor performs nominal services or physical labor gives him no access whatever to information about the issuer and affords no reason for depriving him of the protection of the securities laws.

> . . . . .

> [B]y virtue of their managerial powers and express rights of inspection, [the general partners in this case] could inform themselves as to the condition of the business and, through their efforts, promote its success.

396 F.Supp. at 1222. Similar reasoning was behind the dismissal of a federal securities claim in *Oxford Finance Companies, Inc. v. Harvey*, 385 F.Supp. 431 (E.D. Pa. 1974). The plaintiff had entered into a joint venture with the defendant for the improvement of a parcel of real estate, and was suing for alleged violations of the anti-fraud provisions of the securities acts. But the joint venture agreement had required the approval of the plaintiff for most managerial decisions, and provided for joint control of capital withdrawals. The court held that no investment contract was created, because the control over managerial decisions and over capital withdrawals was each enough to afford the plaintiff "significant protection of its investment."

The same result has been reached by those state courts which have considered the effect of latent partnership control. In *Polikoff v. Levy*, 55 Ill.App.2d 229, 204 N.E.2d 807, *cert. denied*, 382 U.S. 903, 86 S.Ct. 237, 15 L.Ed.2d 156 (1965), the Illinois Court of Appeals held that a joint venture interest in a motel was not a security. Although the defendant had sold a number of interests in the property and the plaintiff had taken no part in its management, the court found that the plaintiff was adequately protected by his "equal right of control over the property and right to know what is going on." Since the plaintiff had assumed the role of a joint venturer, "he did not pay his money with the expectation that future profits from the venture would come solely from the efforts of others." The Texas Court of Civil Appeals came to the same conclusion when faced with the sale of joint venture interests in a tract of undeveloped land near Dallas, Texas. In *McConathy v. Dal Mac Commercial Real Estate, Inc.*, 545 S.W.2d 871 (Tex.Civ.App.–Texarkana 1976, no writ), the court found that the investors expected to hold the property for appreciation and therefore were not dependent on its manager. Where the only management duties of the managing venturer were the maintenance and protection of the property–insuring it, paying taxes and so forth–the court held that an association of persons in a joint venture lacked "the essential element of reliance on the managerial, operational or developmental efforts of others." *See also Oakley v. Rosen*, 76 Cal.App.2d 310, 173 P.2d 55 (1946).

Although general partners and joint venturers may not individually have decisive control over major decisions, they do have the sort of influence which generally provides them with access to important information and protection against a dependence on others. Moreover, partnership powers are not in the nature of a nominal role in the enterprise which a seller of investment contracts would include in order to avoid the securities laws; on the contrary, one would expect such a promoter to insist on ultimate control over the investment venture. An investor who is offered an interest in a general partnership or joint venture should be on notice, therefore, that his ownership rights are significant, and that the federal securities acts will not protect him from a mere failure to exercise his rights.

■ It should be clear from the context of the cases discussed above, however, that the mere fact that an investment takes the form of a general partnership or joint venture does not inevitably insulate it from the reach of the federal securities laws. All of these cases presume that the investor–partner is not in fact dependent on the promoter or manager for the effective exercise of his partnership powers. If, for example, the partner has irrevocably delegated his powers, or is incapable of exercising them, or is so dependent on the particular expertise of the promoter or manager that he has no reasonable alternative to reliance on that person, then his partnership powers may be inadequate to protect him from the dependence on others which is implicit in an investment contract.

Thus, a general partnership in which some agreement among the partners places the controlling power in the hands of certain managing partners may be an investment contract with respect to the other partners. *Pawgun v. Silverstein*, 265 F.Supp. 898 (S.D.N.Y. 1967). In such a case the agreement allocates partnership power as in a limited partnership, which has long been held to be an investment contract. *See generally* 3 Bloomenthal, *Securities & Federal Corporate Law* § 2.12(2) (1979). Similarly, one would not expect partnership interests sold to large numbers of the general public to provide any real partnership control; at some point there would be so many partners that a partnership vote would be more like a corporate vote, each partner's role having been diluted to the level of a single shareholder in a corporation. Such an arrangement might well constitute an investment contract.

A general partner or joint venturer who lacks the business experience and expertise necessary to intelligently exercise partnership powers may also be dependent on the investment's promoter or manager. This sort of dependence was absent in all of the cases, discussed *supra*, which found that passive but powerful investors did not purchase investment contracts. The decision in *Mr. Steak, Inc.* was premised in part on the failure of the franchisee to demonstrate "that it lacked the requisite knowledge, skill or expertise" to manage the restaurant. 324 F.Supp. at 645. The Court of Appeals for the Eighth Circuit was careful to note, in deciding *Fargo Partners*, that it was "not a case where a small investor is helplessly reliant on the promoter's efforts because of lack of business knowledge, finances, or control over the operation." 540 F.2d at 915. The purchasers in *Ballard & Cordell* were themselves oil exploration firms; the partners in *Sloan* and *Hirsch* were professional brokers contesting the sale to them of partnerships in brokerage firms; and the partners in *Oxford Finance Co.* were business corporations. These purchasers or partners were well able to protect themselves. But the same might not be true in other cases. A scheme which sells investments to inexperienced and unknowledgeable members of the general public cannot escape the reach of the securities laws merely by labelling itself a general partnership or joint venture. Such investors may be led to expect profits to be derived from the efforts of others in spite of partnership powers nominally retained by them.

■ A genuine dependence on others might also exist where the partners are forced to rely on some particular non–replaceable expertise on the part of a promoter or manager. Even the most knowledgeable partner may be left with no meaningful option when there is no reasonable replacement for the investment's manager. For example, investors may be induced to enter a real estate partnership on the promise that the partnership's manager has some unique understanding of the real estate market in the area in which the partnership is to invest; the partners may have the legal right to replace the manager, but they could do so only by forfeiting the management ability on which the success of the venture is dependent. Or investors may purchase joint venture interests in an operating business in reliance on the managing partner's unusual experience and ability in running that particular business; again, a legal right of control would have little val-

ue if the partners were forced to rely on the manager's unique abilities. We must emphasize, however, that a reliance on others does not exist merely because the partners have chosen to hire another party to manage their investment. The delegation of rights and duties—standing alone—does not give rise to the sort of dependence on others which underlies the third prong of the *Howey* test. An investor who retains control over his investment has not purchased an interest in a common venture "premised on the reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others," even if he has contracted with the vendor for the management of the property. *Fargo Partners v. Dain Corp., supra; Schultz v. Dain Corp., supra.* So long as the investor retains ultimate control, he has the power over the investment and the access to information about it which is necessary to protect against any unwilling dependence on the manager. It is not enough, therefore, that partners in fact rely on others for the management of their investment; a partnership can be an investment contract only when the partners are so dependent on a particular manager that they cannot replace him or otherwise exercise ultimate control.

 All of this indicates that an investor who claims his general partnership or joint venture interest is an investment contract has a difficult burden to overcome. On the face of a partnership agreement, the investor retains substantial control over his

investment and an ability to protect himself from the managing partner or hired manager. Such an investor must demonstrate that, in spite of the partnership form which the investment took, he was so dependent on the promoter or on a third party that he was in fact unable to exercise meaningful partnership powers.[14] A general partnership or joint venture interest can be designated a security only if the investor can establish, for example, that (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.[15]

Neither of the first two of these factors appears to be present in this case. In the first place, there is no representation or indication in the record that the partnership agreement did not really give the investors partnership powers. The plaintiffs do assert that they did not expect to exercise these powers, and that they in fact purchased their interests on the expectation

---

**14.** We emphasize that this dependence does not by itself establish that a partnership interest satisfies the third prong of the *Howey* test. Where an investment contract exists it is the *original investment* which is *premised on an expectation* of profits to be derived from the efforts of others. As the Supreme Court explained in *Securities & Exchange Commission v. C. M. Joiner Leasing Corp., supra* at 352–53, 64 S.Ct. at 124:

In applying acts of this general purpose, the courts have not been guided by the nature of the assets back of a particular document or offering. *The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.* In the enforcement of an act such as this it is not inappropriate that pro-

moter's offerings be judged as what they were represented to be. [emphasis added] Thus, one would have to show that the reliance on the manager which forms the basis of the partner's expectations was an understanding in the original transaction, and not some subsequent decision to delegate partnership duties. In this case the issue is not raised, as no party has argued that such dependence as may exist was the result of transactions subsequent to the sale of the Property to the joint ventures.

**15.** These are the only factors relevant to the issue that are at all implicated by the facts of this case. But this is not to say that other factors could not also give rise to such a dependence on the promoter or manager that the exercise of partnership powers would be effectively precluded.

that they would rely on Godwin Investments to make all management decisions. But they do not deny that the agreement allowed them to exercise ultimate control should they decide to do so, and it appears that, when trouble arose in late 1975, the plaintiffs did attend joint venture meetings and take a greater interest in important decisions. In the second place, it is clear that the plaintiffs were capable of exercising genuine control over the enterprise. Williamson was Chairman of the Board of Frito–Lay, Inc., at the same time as Lilley was its President; Lilley later succeeded Williamson as Chairman. Wilson and Blake were also high executives in Frito–Lay and had long been closely associated with Williamson and Lilley. The defendants' exhibits contain documents from previous ventures which indicate that Williamson and Lilley had already been members of other joint ventures organized by Godwin Investments, some of which involved tracts of raw land, before any of the joint ventures in question were organized. All of the plaintiffs were, previous to the formation of the joint ventures in question, close associates of William B. Oliver, now deceased, who had been Frito–Lay's President prior to becoming a stockholder and director, during his retirement, of Godwin Investments. On these facts, it is clear that the plaintiffs had the business experience and knowledge adequate to the exercise of partnership powers in a real estate joint venture.

The third factor is more problematic. The plaintiffs argue that they were dependent on Godwin Investment's promise to "plan uses for the property, obtain zoning changes, refinance, manage condemnation proceedings, and develop, lease or sell the property to return a profit." Appellants' Brief 31. It is true that the Property would ultimately have to be developed or sold, and in the interim managed, before a profit could be returned on it; and it is true that Godwin Investments promised to perform these tasks. But this alone does not establish a dependence on Godwin Investments so great as to deprive the plaintiffs of their partnership powers. The plaintiffs must demonstrate that Godwin Investments was uniquely capable of such tasks or that the partners were incapable, within reasonable limits, of finding a replacement manager. Godwin Investment's promise must be more than a binding contract enforceable under state law; it must create the sort of dependence implicit in an investment contract.

There is virtually nothing in the record that is relevant to this precise question. Each of the plaintiffs makes only the vague statement, in his affidavit in opposition to the defendants' motions under Rules 12(b)(1) and 56, that "I relied and was dependent upon the efforts" of the manager of the Property. The issue is complicated by the confusion over the purposes for which the investment was made. Williamson stated in deposition that he did not expect the Property to be developed by the venture:

> [A]t the time I went into this, I stated to them all that I wouldn't spend a dime on improving the property, and the way this was set up was for a short period turnover ... and I for one, expressed myself to the other joint venturers and to everybody concerned that I was not interested at any time to do any development ....

Williamson Deposition at 223–24. If the object of the deal was purely that which Williamson describes–to hold the land for short–term appreciation–it is difficult to imagine any genuine dependence on Godwin Investments. The only tasks mentioned by the plaintiffs that might conceivably involve some particular non–replaceable expertise during a period in which raw land is merely held for appreciation are the procuring of zoning changes and the management of condemnation proceedings. But Godwin Investments represented in its sales materials that it would either sell or develop the Property, and that one of these paths would be taken before 1978, the end of the interest–only period. Whatever the primary purpose of the investment, it does not appear that the plaintiffs' dependence on Godwin Investments was directly addressed by the district court or by the parties in discovery. Much is made of the

expectations of the joint venturers–that they would play only a passive role–and of the powers they actually possessed–as partners, pursuant to joint venture agreements–but there is little in the record that bears on the dependence of the plaintiffs on the expertise of Godwin Investments.

■ We conclude, therefore, that a material issue of fact remains to be resolved in this case (thereby precluding summary judgment at this point): whether the plaintiffs were so dependent on the expertise of Godwin Investments for the management, sale or development of the Property that they could not effectively exercise their partnership powers. But we need not remand this case for further discovery on this point in order to rule on the district court's dismissal for lack of subject matter jurisdiction. Even assuming that the district court could have found and did find that no such dependence existed, we could not say that the plaintiffs' federal cause of action "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction" or that it is "wholly insubstantial and frivolous." We recognize that the law places an extremely difficult burden on the plaintiffs if they are to establish that the joint venture interests they purchased are securities. Nevertheless it would be too great a stretch to say that their argument "has no plausible foundation," and as our discussion of the law should indicate, their claim is by no means "clearly foreclosed by a prior Supreme Court decision."

## IV. THE PURCHASE MONEY NOTES

The definitional section of each of the 1933 Act and the 1934 Act, *see supra* note 11, includes "any note" within its purview. But section 3(a)(10) of the 1934 Act excludes from the definition "any note . . . which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."

Despite the literal wording of the exception, many courts have recognized that a precise reliance on it would thwart the purposes of the securities acts, and have therefore turned to more functional approaches in deciding when a note becomes a security. *See, e. g., Amfac Manufacturing Corp. v. Arizona Mall of Tempe, Inc.,* 583 F.2d 426 (9th Cir. 1978); *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252 (9th Cir. 1976); *Exchange National Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126 (2d Cir. 1976); *C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc.,* 508 F.2d 1354 (7th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); *Zeller v. Bogue Electric Manufacturing Corp.,* 476 F.2d 795 (2d Cir.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973); *Lino v. City Investing Co.,* 487 F.2d 689 (3d Cir. 1973); *Sanders v. John Nuveen & Co., Inc.,* 463 F.2d 1075 (7th Cir.), *cert. denied,* 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972). *See generally* E. Sonnenschein, "Federal Securities Laws Coverage of Note Transactions: The Antifraud Provisions," 35 *Bus.Law.* 1567 (July, 1980).

We have followed one such functional approach and held that an investment note is a security while a commercial note is not a security, regardless of the literal reach of the definitional sections and the exception written into section 3(a)(10) of the 1934 Act. In *McClure v. First National Bank of Lubbock, Texas,* 497 F.2d 490 (5th Cir. 1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975), we explained:

> We realize that our holding today that the Act does not apply to commercial notes of a longer duration than nine months, taken with the decisions voiding the short–term exemption as to investment paper, virtually writes that exemption out of the law. On the one hand, the Act covers all *investment* notes, no matter how short their maturity, because they are not encompassed by the "any note" language of the exemption. On the other hand, the Act does not cover any *commercial* notes, no matter how long their maturity, because they fall outside the "any note" definition of a security. Thus, the investment or commercial nature of a note entirely controls the

applicability of the Act, depriving of all utility the exemption based on maturity–length.

497 F.2d at 494–95. *Accord, National Bank of Commerce of Dallas v. All American Assurance Co.*, 583 F.2d 1295 (5th Cir. 1978); *Securities & Exchange Commission v. Continental Commodities Corp.*, 497 F.2d 516 (5th Cir. 1974); *Bellah v. First National Bank of Hereford, Texas*, 495 F.2d 1109 (5th Cir. 1974); *First Federal Savings & Loan Association v. Mortgage Corp. of the South*, 467 F.Supp. 943 (N.D. Ala.1979), *appeal docketed*, No. 79–2141 (5th Cir., May 10, 1979); *Sea Pines of Virginia, Inc. v. PLD, Ltd.*, 399 F.Supp. 708 (M.D.Fla.1975).

It is easier to state that the "investment–commercial" distinction is the basis of our decisions than it is to formulate any comprehensive definition of those terms. We have followed, instead, a case by case approach, relying in each instance on "the economic realities underlying [the] transaction, and not on the name appended thereto," *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975). We must begin, therefore, by examining the cases in which we have applied this test. In *Bellah v. First National Bank of Hereford, Texas, supra*, the plaintiffs owned a livestock business for which they had borrowed operating funds from the bank. They executed a six–month promissory note, secured by a deed of trust covering seventeen tracts of real estate, to the Bank. We found that the bank merely intended to aid the owners in the operation of their livestock business and did not seek to profit from the successful operation of the enterprise. On this basis we found that the notes were commercial in nature and thus not securities, and dismissed the case for lack of subject matter jurisdiction.

In *McClure v. First National Bank of Lubbock, Texas, supra*, the plaintiff owned 50% of a corporation which had borrowed funds from the bank, for which it had executed a six–month promissory note secured by a deed of trust on the corporation's real estate. The plaintiff contended that her consent had been obtained for the transaction on the representation of her husband, who owned the other 50% of the corporation, that the funds would be used to pay corporate obligations; in fact, they were used to repay the husband's personal obligations. We found that the note issued to the bank was not a security, and dismissed the case for lack of subject matter jurisdiction. Our decision was based on the absence of two factors which are typically present where "investment notes" are found to exist. First, only the bank and the corporation were involved in the transaction. The corporation's notes were not offered to some class of investors, nor were they acquired by the bank for speculation or investment. Second, the loan was extended solely to allow the corporation to pay off its business debt. Thus, the corporation did not obtain investment assets with the proceeds of the loan. The fact that neither of these elements was present was a strong indication that the notes were "commercial" in nature; but, as we stated in *McClure*, these two factors "are not necessarily the only ones appropriate for consideration," 497 F.2d at 493.

In *Securities & Exchange Commission v. Continental Commodities Corp., supra*, a commodities options dealer issued notes to some of its customers in partial reimbursement of sums owed them upon the suspension of trading in futures options. The complaint alleged that Continental Commodities Corp. exacted a promise of forebearance from legal action from those of its customers who accepted 60% of their original investments in cash and the remaining 40% in the form of non–interest bearing, short–term promissory notes. The firm allegedly represented that the S.E.C. would allow it to remain in business if payments were made to all of its customers on such terms. We held that the notes were securities because they were issued "to rejuvenate and not to liquidate the enterprise," 497 F.2d at 527, and therefore reversed the district court's order dismissing the case for lack of subject matter jurisdiction. Customers accepted the notes on the hope that the firm would be revived. They had a

genuine stake in the survival of the firm, for they could expect a higher return on their investments in the event the firm survived than in the event it were forced into bankruptcy.

In *National Bank of Commerce of Dallas v. All American Assurance Co., supra,* the bank sought to recover damages from borrowers who had allegedly pledged worthless stock in procuring a loan. We held that the note executed by the borrowers was commercial in nature, and affirmed the district court's order dismissing the case for lack of subject matter jurisdiction. There was nothing in the transaction to indicate that it was anything other than a loan evidenced by a promissory note and secured by a pledge of securities. We relied on the facts that there were no special investment rights given to the payee; that the note was payable in fixed amounts at fixed times; that repayment was not conditioned upon profit or productivity of the company; that no class of investors was involved; and that the bank anticipated no gain beyond repayment of the note with interest.

In several instances district courts in the Fifth Circuit have applied the investment-commercial distinction and determined whether a note was a security. In *Sea Pines of Virginia, Inc. v. PLD, Ltd., supra,* the maker of a note executed as purchase money for a real estate limited partnership interest sought a preliminary injunction to prevent collection by the payees, on the basis of securities acts violations. The court denied the injunction. It held that the note was commercial because it served as a "cash substitute" for the purchase price. The acquisition of the note was not the motivating factor behind the defendant's sale of a limited partnership interest; the real object of the transaction was an exchange of the property for the purchase price, which in this case was accepted in the form of a note. In *First Federal Savings & Loan Association of Miami v. Mortgage Corp. of the South, supra* (summary judgment granted against the defendants on other grounds), the court found that a note issued to a lender who provided the permanent financing for an apartment complex

development was an investment note and therefore a security. The court relied on the facts that the note was long-term (twenty years); that the permanent lender had initiated the transaction, and was in fact seeking loans of this nature throughout the country; that the lender was a third party to the initial transaction (the construction loan); that the negotiations which preceded the purchase of the notes indicated an awareness on the part of all parties that the successful management and completion of the project would determine the value of the notes; and that the lender acquired a substantial security interest in the projects which, given the size of the loans, created a dependence of the permanent lender on the developer and on the initial lender. *See also Strain v. Citizens Bank & Trust Co.,* 68 F.R.D. 697, 701–02 (E.D.La.1975).

Although different factors were decisive in these various decisions, a common concern seems to underlie them: the degree of dependence of the note holder on the success or profitability of a common investment enterprise. This theme is implicit in the Supreme Court's recent admonition, in *United Housing Foundation, Inc. v. Forman, supra,* that the "investment contract" concept underlies the definition of a security in all of its forms:

> We perceive no distinction, for present purposes, between an "investment contract" and an "investment commonly known as a 'security.'" In either case, the basic test for distinguishing the transaction from other commercial dealings is "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Howey,* 328 U.S., at 301, [66 S.Ct., at 1104.]. This test, in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security. The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. By profits,

the Court has meant either capital appreciation resulting from the development of the initial investment, as in *Joiner, supra* (sale of oil leases conditioned on promoters' agreement to drill exploratory well), or a participation in earnings resulting from the use of investors' funds, as in *Tcherepnin v. Knight, supra* (dividends on the investment based on savings and loan association's profits).

421 U.S. at 852, 95 S.Ct. at 2060. In *Forman* the Court went so far as to hold that *shares of stock* in a cooperative housing corporation were not securities. The shares merely entitled the holders to rent low–rent apartments owned by the cooperative. Although the cooperative took the form of a corporation, it was a non–profit corporation which was never expected to provide a cash return to the holders of its shares. Therefore the purchase of stock in the corporation was not "premised on a reasonable expectation of profits"–as are all investment contracts–and the shares were not securities.

In order to apply *Forman* in the context of note transactions, we must begin by recognizing that note holders generally receive only "interest" on the amount of the note and rarely "share in the earnings and profits" in the most literal sense. But a note holder may nevertheless be *dependent* on the *profitability* of the enterprise for the payment of interest or the return of principal. Unless the note holder's reliance on the success of the enterprise is insignificant, the holder can be said, in effect, to share in the profits of the enterprise in the sense contemplated by the Supreme Court in *Forman.*[16]

In practice, this analysis rests on a wide range of factors. At the extreme ends of the spectrum, the result of application of these factors will be clear; "[i]n between is a gray area which, in the absence of further congressional indication of intent or Supreme Court construction, has been and must be in the future subjected to case–by–case treatment." *C. N. S. Enterprises, Inc. v. G. & G. Enterprises, Inc., supra* at 1359.

■ The promissory notes involved in this case, however, are clearly not securities, for the holders of the notes were not in *any* sense dependent on the success or profitability of a common investment enterprise. In the first place, the purchasers of the notes did not invest in a common venture. Each purchaser primarily relied on the fifteen or so individual obligors who had executed the note he purchased. The ability of those obligors to repay the note depended on their individual financial ability– not on the success of any common venture. In the second place, the purchasers of the notes did not rely on the profitability of any investment. The note holders were dependent, instead, on the general liability of the payors and on the real estate pledged as security. Although liability was several, each venturer was fully liable for his portion of the venture's debt, and there is no suggestion in the record that any or all of the venturers were poor credit risks at the time the notes were issued. The note holders retained a vendor's lien on the Property and deeds of trust were executed in their favor. Moreover, the notes were purchase money notes, that is, they were taken by the original owners of the Property in order to finance the sale of the Property to the plaintiffs. The crux of the transaction was the sale of the Property, not the purchase of promissory notes.[17] This is not to say

---

16. Our analysis is different from the risk capital approach employed by some courts. Although that test also relies on the definition of an investment contract, *e. g., United California Bank v. THC Financial Corp.*, 557 F.2d 1351 (9th Cir. 1977), it has been interpreted (at least in the Ninth Circuit) to place a much greater reliance on the *extent* of the risk than do we. *See Great Western Bank & Trust v. Kotz*, 532 F.2d 1252 (9th Cir. 1976).

17. The plaintiffs argue that the defendants sought long–term promissory notes in exchange for their property because of particular "investment characteristics" of the notes, *i. e.* liquidity, easier use as pledged security for a bank loan, and installment contract tax treatment. But these factors are not relevant to the investment–commercial note distinction. There is no doubt that the defendants were concerned with the manner in which the purchase price was to be paid, but none of these

that "investment notes" cannot be taken by a seller of real estate. The determinative factor is the dependence of the note holder on the profitability of a common investment enterprise, and not on any technical characterization of the note holder as "note purchaser" or "real estate vendor." But where notes are accepted in order to finance the sale of another asset, the prima facie purpose of the note transaction is to lend money to the purchaser on the security of the assets sold, not to invest in a common investment enterprise. Consequently, purchase money notes have generally been held not to be securities. *Emisco Industries Inc. v. Pro's Inc.*, 543 F.2d 38 (7th Cir. 1976); *Lino v. City Investing Co., supra*; *Chess v. Nieport*, 386 F.Supp. 312 (E. D. Cal.1974); *Altman v. Knight*, 431 F.Supp. 309 (S.D.N.Y. 1977); *Sea Pines of Virginia, Inc. v. PLD, Ltd., supra.* We hold, therefore, that the promissory notes executed by the plaintiffs are commercial in nature and, as a matter of law, are not securities within the meaning of the 1933 Act and the 1934 Act.

We need not determine, however, whether the plaintiffs' federal securities claim in relation to the notes are so clearly immaterial or insubstantial that they can be dismissed for lack of subject matter jurisdiction. Each of the plaintiffs' federal securities claims is also based on their purchase of joint venture interests in the Property, and, as we determined above, these claims cannot be dismissed for lack of subject matter jurisdiction. We do note, however, that in the four recent instances in which we have considered whether a note was a security within the meaning of the federal securities acts—i. e., *National Bank of Commerce of Dallas v. All American Assurance Co., supra*; *McClure v. First National Bank of Lubbock, Texas, supra*; *Securities & Exchange Commission v. Continental Commodities Corp., supra*; *Bellah v. First National Bank of Hereford, Texas, supra* —the issue was raised in the form of a motion to dismiss for lack of subject matter jurisdiction. Although it does not appear that the appropriateness of such a motion was chal-

lenged, we did not find in any of these cases that it was improper.

We conclude that the judgment of the district court dismissing this case for lack of subject matter jurisdiction must be reversed because the plaintiffs' federal securities claims, insofar as they arise out of the purchase of joint venture interests, are not so clearly immaterial or insubstantial as to justify their dismissal under the strict standard mandated by *Bell v. Hood, supra.* We also reverse the judgment of the district court awarding costs to the defendants. We remand this case to the district court for further proceedings consistent with this opinion.

REVERSED and REMANDED.

---

particular preferences indicate that they wished to "invest" in the note, that is, to share in the risk and profits of a common investment enterprise.