**FARGO PARTNERS, a North Dakota Partnership, Plaintiff,**

v.

**DAIN CORPORATION et al., Defendants.**

Civ. No. A3–75–47.

United States District Court, D. North Dakota, Southeastern Division.

Dec. 31, 1975.

Frank J. Magill, Nilles, Hansen, Selbo, Magill & Davies, Ltd., Fargo, N. D., for plaintiff.

E. T. Conmy, Jr., Conmy, Feste & Bossart, Ltd., Fargo, N. D., for Dain Corp. and Northwestern Nat. Bank; Lawrence

740

C. Brown, Thomas L. Kimer, Faegre & Benson, Minneapolis, Minn., of counsel.

Jack G. Marcil, Tenneson, Serkland, Lundberg & Erickson, Fargo, N. D., for Viking Investment, Mark Q. Moore, Allen L. Moore and Howard B. Conkey, Jr. and Candletree; Morris, Mitchell, Larson, King, Stamper & Bold, Kansas City, Mo., of counsel.

## MEMORANDUM AND ORDER

BENSON, Chief Judge.

■ This is an action alleging fraud and deceit in violation of the Federal Securities Act of 1933, the Federal Securities Exchange Act of 1934, and the rules and regulations promulgated thereunder. Upon a theory of pendent jurisdiction, Plaintiff also alleges a number of violations of state law. On motion of Defendant Dain Corporation, a Rule 12(d) preliminary hearing was held on the issue of subject matter jurisdiction. The issue presented is whether the transaction described in the Complaint involved the offer and sale of a security as that term is defined in 15 U.S.C. §§ 77b(1) and 78c.[1] If no "security" exists, the Court lacks jurisdiction of the subject matter. It is the finding of this Court that the transaction in question did not involve a security as that term has been defined by the Supreme Court.

*S. E. C. v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); *S. E. C. v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed.2d 88 (1943). *See also United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975).

Plaintiff, Fargo Partners, is a partnership doing business in Fargo, North Dakota. Defendant Dain Corporation is a Minnesota corporation. Candletree is a partnership consisting of Mark Q. Moore, Allen L. Moore, and Howard B. Conkey, Jr., of Lawrence, Kansas. Viking Investment is a Kansas corporation and its officers are partners in Candletree.

Fargo Partners (hereinafter "Fargo") entered into an agreement with Candletree, whereby Fargo purchased an apartment development in Blue Springs, Missouri. Dain Corporation functioned in the role of broker. Specifically, Candletree conveyed by warranty deed and bill of sale the project to Fargo in return for a promissory note for $3,375,000.00, with interest. The note was secured by a trust deed and an assignment of rents, leases and profits. Pursuant to the agreement, Fargo has paid Candletree the sum of $265,650.00.

Viking Investment and the three individual partners of Candletree guaranteed Candletree's performance, and fur-

1. The 1933 Securities Act defines the term "security" to mean:

"any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract,* voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." 15 U.S.C. § 77b(1).

The 1934 Securities Exchange Act defines the term "security" to mean:

"any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collater-

al-trust certificate, preorganization certificate or subscription, transferable share, *investment contract,* voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." 15 U.S.C. § 78c(a)(10).

*United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 847, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 (1975) observed that "the definition of a security in . . . [15 U.S.C. § 78c(a)(10),] is virtually identical [to the definition in 15 U.S.C. 77b(1)] and, for present purposes, the coverage of the two Acts may be considered the same."

ther agreed to indemnify Fargo and hold Fargo harmless from any costs, expenses or damages, including reasonable attorney fees caused by any default of Candletree.

As part of the transaction, Fargo signed a management agreement granting back to Candletree or its agents or representatives under its control, exclusive right to management of the property consisting of the apartment project with 248 dwelling units. This grantback, among other things, included Candletree's right to handle marketing for rent up; to offer for rental not only the dwelling units but any other concessions, including preparation for initial rent-up; to set up tenant selection policy; to show the premises to prospective tenants; to process applications for rental; to prepare dwelling leases and execute same in its own name; to collect, deposit and disburse security deposits; to collect rent, charges and other accounts receivable to be deposited in an account in its own name; to secure full compliance by each tenant with the terms of the lease; to comply with local codes; to investigate service requests of tenants; to make arrangements for utilities; and from said funds collected and deposited, make disbursement for wages, taxes, assessments and payments on debt service on the financing with any remaining balance not required for working capital purposes to be paid monthly to Fargo.

It is alleged that the anticipated profits would not be dependent on any efforts by Fargo as investors. The sale of the Blue Springs project was purportedly offered and consummated by the defendants through advertising, sales literature, promotional schemes, prospectuses, and other writings and oral representations emphasizing the economic benefits to Fargo to be derived from the management skills and efforts of Candletree, Viking and their agents or representatives whom they controlled. The plaintiff also alleges that when defendants were soliciting its purchase of this housing project, false representations were made concerning the expected returns from the venture via the United States mails. The issue raised by the Defendant, Dain, is whether this transaction is the purchase and sale of a "security". For the purpose of ruling on defendant's motion to dismiss, the Court assumes the truth of the plaintiff's allegations. See Spector v. L. Q. Motor Inns, Inc., 517 F.2d 278 (5th Cir. 1975).

Defendant Dain argues that the transaction is merely a sale of real estate which cannot be construed to involve the purchase or sale of a "security". Plaintiff finds the transaction more sophisticated. The purchase agreement and warranty deed together with the management contract incident to the investment which provided a complete grantback of management rights to Candletree allegedly constitute an investment contract within the purview of the federal securities law. It is further contended the profitability of the venture was solely dependent on the efforts of Candletree in exercising its limited duties under the management clause. Although the management offer was for a limited period of 36 months, there is no indication Fargo ever intended to use its own efforts to run the apartment project. Instead, plaintiff alleges it bought a "security" when it invested in the project. It is noted however that Fargo retained the right to terminate its management contract on thirty days notice.

 The meaning of the word "security"[2] within the federal security law is found in S. E. C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), and S. E. C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). Both decisions dealt with investment contract securities, 15 U.S.C. § 78c(a)(10), the type which

---

2. Whether a particular investment constitutes a security depends upon the facts and circumstances of each individual case. S. E. C. v. Joiner, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943); S. E. C. v. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). It would be improper for the Court to consider other projects in which the defendants became involved.

plaintiff alleges is involved here, and both set forth the basic proposition that an investment contract exists when a purchaser is led to invest money in a common enterprise with the expectation that profits would be collected solely through the efforts of others. The Supreme Court has stated that when interpreting the meaning of the word "security", "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). The Court must consider the economic realities of the transaction. *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 851–852, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). Not only is an investment contract determinable by the nature of what the sellers actually sell, but equally by

"what character the instrument is given . . . by the terms of the *offer,* the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be." *S. E. C. v. C. M. Joiner Leasing Corp.,* 320 U.S. 344, 352–353, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943). (emphasis added).[3]

The Court has defined an investment contract more specifically as

"a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *S. E. C. v. W. J. Howey & Co.,* 328 U.S. 293, 298–299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946).

In *Howey,* the Court of Appeals had concluded that an investment contract did not exist where the management and cultivation of citrus acreage was entrust-

ed to the promoter, with the rate of the investor's return to be measured by the produce from the acreage he owned. The Court of Appeals found:

"Here it is quite clear that each purchaser looked for the income from his investment to the fruitage of his own grove and not to the fruitage of the groves as a whole. *It is quite clear, too, that each purchaser's income was in no sense dependent upon the purchase or development of other tracts than his own except in the sense that as grove owners generally prospered, each owner of a grove would.*" (emphasis added). *S. E. C. v. W. H. Howey & Co.,* 151 F.2d 714, 717 (5th Cir. 1945).

In reversing, the Supreme Court emphasized not whether profits were pooled, but rather the fact that the feasibility and success of the enterprise, in attracting individuals to invest, and in cultivating, harvesting and marketing the citrus products, rested on the availability of the Howey Company's management:

"Such persons have no desire to occupy the land or to develop it themselves; they are attracted solely by the prospects of a return on their investment. Indeed, individual development of the plots of land that are offered and sold would seldom be economically feasible due to their small size. Such tracts gain utility as citrus groves only when cultivated and developed as component parts of a larger area. *A common enterprise managed by respondents or third parties with adequate personnel and equipment is therefore essential if the investors are to achieve their paramount aim of a return on their investments.*" (emphasis added). 328 U.S. at 300, 66 S.Ct. at 1103.

Applying the standard it created, the Court found:

*See also Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Tcherepnin v. Knight,* 389 U.S. 332, 336; 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

---

**3.** The Court also notes initially that the federal securities laws are to be construed "not technically and restrictively, but flexibly to effectuate [their] remedial purpose." *S. E. C. v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 195, 84 S.Ct. 275, 285, 11 L.Ed.2d 237 (1963).

"The transactions in this case clearly involve investment contracts as so defined. The respondent companies are offering *something more than fee simple interests in land, something different from a farm or orchard coupled with management services.* They are offering an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by respondents. They are offering this opportunity to persons who reside in distant localities and who lack the equipment and experience requisite to the cultivation, harvesting and marketing of the citrus products." (emphasis added). 328 U.S. at 299–300, 66 S.Ct. at 1103.

The *Howey* test was restated in *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), wherein the Supreme Court made the additional comment:

"This test, in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security. The touchstone is the presence of an investment in a *common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. By profits, the Court has meant either capital appreciation resulting from the development of the initial investment,* as in *Joiner, supra* (sale of oil leases conditioned on promoters' agreement to drill exploratory well), *or a participating in earnings resulting from the use of investors' funds,* as in *Tcherepnin v. Knight, supra* (dividends on the investment based on savings and loan association's profits)." (emphasis added). 421 U.S. at 852, 95 S.Ct. at 2060.

Fargo purchased the housing project as an investment for the purpose of profit, but the primary concern here is whether the offer to Fargo, or the arrangement entered into between Fargo and Candletree is a "common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."[4] The Court has reviewed the present record and the evidence presented at the evidentiary hearing in light of the principle that all doubts on jurisdictional points must be resolved in favor of a plenary trial rather than dismissal at the pretrial stage. *See Miller v. Central Chinchilla Group, Inc.,* 494 F.2d 414, 417 (8th Cir. 1974); *Zunamon v. Brown,* 418 F.2d 883, 886 (8th Cir. 1969). The Court concludes Fargo's venture was not a "common enterprise" or "common venture" as those terms have been defined by the Supreme Court.

Exhibit 3 received in evidence at the preliminary hearing is a prospectus of the Blue Springs project presented to Fargo prior to its entering into the purchase agreement. There is nothing in the pleadings, the prospectus, or any part of the record to establish that defendants were seeking Fargo's money for anything other than a sale of some developed real estate. The money was not to be used on a continuing development in which both parties would profit from the entrepreneurial efforts of the seller. The seller agreed to manage the property to be owned in its entirety by the buyer for a sum equal to 5% of gross rental and for a term of 36 months. The management fees were not related to net profits. In addition a leaseback arrangement was presented whereby:

"Builder agrees to repurchase land at completion for 350,000 (*proceeds to be used to reduce above mortgage principal due*) and lease it back to buyer at

---

4. The Ninth Circuit has defined a "common enterprise" as "one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." *Securities & Exch. Com'n v. Glenn W. Turner Ent. Inc.,* 474 F.2d 476, 482 n.7 (9th Cir. 1973) cert. denied 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). *See also El Khadem v. Equity Securities Corporation,* 494 F.2d 1224, 1229 (9th Cir. 1974). Under this definition, this Court would be faced with the question of whether Fargo Partner's fortunes were dependent upon the success of Candletree's business operations.

"$38,500 per year for 75 years. Buyer will have the right of repurchase in the tenth year at a t.b.d. adjusted price."

If the buyer entered into the land repurchase venture, a rental was to be paid for the use of the land. The profits that Fargo Partners could expect would come from the net profits from the Blue Springs apartment complex which it now owned and in which defendants no longer had anything more than a terminable management contract and a separate real estate interest with a fixed rent, plus a mortgage. The ". . . something more than fee simple interests in land, something different from a farm or orchard coupled with management services. . . ." which the Supreme Court found in *Howey* is not present here.

The Court finds it is without subject matter jurisdiction.

It is ordered that the Complaint is dismissed.