568 F.2d 612
 Fed. Sec. L. Rep. P 96,303
John C. SCHULTZ, Ethel J. Schultz, John R. Schultz, William
C. Schultz, Susan J. Schultz and Nancy J. Schultz,
Appellants,
v.
DAIN CORPORATION, Viking Investment Corporation, Mark Q.
Moore, Allen L. Moore and Howard B. Conkey, Jr.,
Individually and d/b/a a partnership under the name of
Candletree, and Candletree, a Kansas partnership, Appellees.
 No. 77-1398.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 18, 1977.
Decided Jan. 27, 1978.
 
 Stephen W. Plambeck, Nilles, Hansen, Selbo, Magill & Davies, Fargo, N. D., for appellants.
 Gregory R. Howard, Faegre & Benson, Minneapolis, Minn., for appellee, Dain Corp.; Lawrence C. Brown, Minneapolis, Minn., and E. T. Conmy, Jr., Conmy, Feste & Bossart, Fargo, N. D., on brief.
 Jack G. Marcil, Tenneson, Serkland, Lundberg & Erickson, Fargo, N. D., for all other appellees.
 Before GIBSON, Chief Judge, HEANEY, Circuit Judge, and HUNTER, District Judge.*
 HEANEY, Circuit Judge.
 
 
 1
 John C. Schultz, and members of his family, appeal from an order of the District Court for the District of North Dakota dismissing their complaint for lack of subject matter jurisdiction. The appellees are Viking Investment Corporation; Dain Corporation; and Candletree, a Kansas partnership, and its partners individually. Candletree's partners are also the officers, directors and sole shareholders of Viking.
 
 
 2
 On July 1, 1973, Schultz purchased an apartment complex in Topeka, Kansas, from Candletree for $4,825,000. Viking was building the complex and Dain functioned as broker. Schultz paid $25,000 in cash and gave a nonrecourse promissory note for the balance. Schultz also created a tenancy in common in the complex. He retained a 40.737% Interest for himself and divided the remainder among his family.[1]
 
 
 3
 In accordance with the purchase agreement, Schultz entered into a management agreement with Candletree. The management agreement provided for the appointment of Candletree as exclusive agent for the management of the complex. In general, Candletree was to prepare the apartments for rental, seek out prospective tenants, prepare and execute leases, collect rents, secure full compliance by each tenant with the terms of the lease and maintain the apartments. Candletree was entitled to an initial fee of $96,000 and a monthly management fee of 4% Of the gross income of the complex as compensation. The management agreement was to be effective for three years. It could only be cancelled if Schultz sold more than 90% Of his interest in the complex, if Schultz defaulted under the purchase agreement or by mutual consent of the parties. Candletree could delegate its management obligations if Schultz gave prior written approval. Candletree chose to do so and delegated its management obligations to Viking with Schultz's consent.
 
 
 4
 The complex proved to be financially unsuccessful, and the mortgage on the project was foreclosed. On August 15, 1975, Schultz brought suit against the appellees alleging that they had fraudulently and deceitfully induced him to invest in the complex in violation of the Securities Act of 1933, 15 U.S.C. §§ 77a et seq, and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq.[2] He claimed damages of $942,980 as a direct result of the transaction. Schultz asserted that the purchase agreement, warranty deed and management agreement incident to his investment constituted an investment contract and, thus, a security as defined under § 2(1) of the Securities Act and § 3(a)(10) of the Securities Exchange Act.[3] 15 U.S.C. §§ 77b(1), 78c(a)(10).
 
 
 5
 The appellees moved to dismiss the complaint maintaining that the District Court lacked subject matter jurisdiction because the transaction did not involve a security. Prior to a preliminary hearing on the matter, Schultz moved to stay all further proceedings pending an appeal to this Court from a dismissal of the complaint in Fargo Partners v. Dain Corporation, 405 F.Supp. 739 (D.N.D.1975). Fargo Partners involved a similar apartment complex sale and many of the same parties that are involved in this action. In that case, the District Court had found that the transaction did not involve a security and since no security existed, it lacked subject matter jurisdiction. Id. at 740.
 
 
 6
 In support of Schultz's motion, counsel for both Schultz and the plaintiffs in Fargo Partners stated that this action "is substantially on all fours with * * * (Fargo Partners ) especially with respect to the question of whether or not the transactions at issue involve the purchase and sale of a security." The District Court granted the motion and stayed further proceedings. We affirmed the dismissal of the complaint in Fargo Partners. Fargo Partners v. Dain Corp., 540 F.2d 912 (8th Cir. 1976). After a preliminary hearing, the District Court in this case dismissed Schultz's complaint relying on our decision in Fargo Partners.
 
 
 7
 Schultz argues on appeal that the purchase agreement, warranty deed and management agreement incident to this transaction together were an investment contract. He now attempts to distinguish Fargo Partners by saying that his management contract did not provide for a thirty-day cancellation period, as did the one in Fargo Partners,[4] and that the sale of the complex was conditioned on his acceptance of the management contract.
 
 
 8
 The starting point for any analysis of what constitutes an investment contract under the federal securities laws is S. E. C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In Howey, an investment contract was defined as:
 
 
 9
 a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.
 
 
 10
 Id. at 298-299, 66 S.Ct. at 1103.
 
 
 11
 See also United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 852, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). See generally Annot., 3 A.L.R.Fed. 592 (1970); 3 H. Bloomenthal, Securities and Federal Corporate Law §§ 2.04, 2.19, 2.19B (1976 rev.); H. Sowards, 11 Business Organizations Federal Securities Act § 2.01 (1977).
 
 
 12
 In Howey, a company which owed large citrus groves sold small tracts of land[5] to individual investors. The tracts were not separately fenced; the sole indication of separate ownership was found in small land markings. The investors were also offered a service contract whereby the company agreed to cultivate, harvest and market the crop. The company explained to the investors that it was uneconomic to purchase the land without the service contract, and 85% Of the acreage sold was so covered. The service contract was for a ten-year period and there was no option to cancel. The investors had no right of entry. Most investors were nonresidents and lacked the necessary knowledge, skill and equipment to care for the trees. The Court recognized that "something more than fee simple interests in land, something different from a farm or orchard coupled with management services" was needed to convert these sales of land into investment contracts. That "something more" was the company's plan to gather the individual plots and manage them as one. See also SEC v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943). The investors realized that they were part of a larger scheme, the success of which depended on the company's ability to manage a large grove. The plan ran "through the whole transaction as the thread on which everybody's beads were strung." Id. at 348, 64 S.Ct. at 122. The only way the investors could hope for a return on their investment was by absolute reliance on the effort and abilities of the company.
 
 
 13
 In Fargo Partners, we found the element of absolute reliance to be lacking. There was no indication that the nature of the transaction required the investor to rely on the efforts of the seller or third parties for a profit. Rather, the investor demonstrated his ultimate control over the complex by reserving the right to manage the business. It was irrelevant whether he chose to exercise the right or not. We concluded that the transaction involved nothing more than the sale of an apartment complex coupled with management services.
 
 
 14
 The element of absolute reliance is also lacking in this case. The nature of the transaction did not require Schultz to surrender his individual control. His position is that of any landowner who does not wish to manage a property himself and delegates the responsibility to an agent. The fact that he did not possess a unilateral right to cancel the management contract is insufficient in and of itself to convert the sales transaction into an investment contract. As owner of the complex, Schultz was free to enter into the management contract and to negotiate its terms. Although he could not unilaterally cancel the contract during its duration, at the end of the three years he was free to negotiate a new management contract with someone other than Viking. Thus, Schultz retained ultimate control over the apartment complex. See Fargo Partners v. Dain, supra at 915; Mr. Steak, Inc. v. River City Steak, Inc., 460 F.2d 666, 669-670 (10th Cir. 1972). Moreover, Schultz continued to exercise certain supervisory rights. The construction of the apartment complex, the maintenance and leasing of the apartments and the complex's accounting system were subject to Schultz's inspection and approval. In addition, Schultz could defer payments under the promissory note or offset against such payments the amount of any damages incurred as a result of any default under the purchase agreement or management agreement.
 
 
 15
 Schultz's argument that the transaction was conditioned upon his executing the management contract suggests that he was not, in fact, free to negotiate the management contract at its inception. However, this argument cannot stand in light of the facts[6] which show that the management contract was not a requirement of the appellees but of the mortgage lender.
 
 
 16
 Viking had made arrangements with Teacher's Insurance and Annuity Association of America for long-term financing of the complex. Viking obtained a mortgage loan from Teacher's for $3,900,000. Under the terms of the loan agreement, Viking was to be "the sole and exclusive management agents for the apartment complex * * * for a period of five years." Management could be assigned to a management entity, subject to Teacher's approval, if it was experienced in apartment management in the Topeka area. Viking subsequently assigned the loan to Schultz who assumed the commitments.
 
 
 17
 Schultz makes no allegation that he could not have obtained alternative financing and dispensed with Viking's services. There is no allegation that Schultz attempted to find another manager experienced in apartment management in the Topeka area. Neither does he allege that Teacher's would not have given their consent to an assignment if he had found another manager. The management contract was not a condition of the sale but was a condition of the particular long-term financing arrangement.[7] The SEC rulings cited by Schultz support this position. They indicate that a management contract must be a condition of the sale before a security exists. See (1973) Fed.Sec.L.Rep. (CCH) P 79,471; (1973) Fed.Sec.L.Rep. (CCH) P 79,163.
 
 
 18
 As we noted in Fargo Partners, this is not the case where a small investor must rely on the seller's efforts because he lacks business knowledge, finances or control over the operations. Schultz had considerable business expertise and consulted extensively with a tax and business adviser before making the investment. See Fargo Partners v. Dain Corp., supra at 915; Mr. Steak, Inc. v. River City Steak, Inc., supra at 670.
 
 
 19
 The dismissal of the complaint is affirmed.
 
 
 
 *
 ELMO B. HUNTER, United States District Judge, Western District of Missouri, sitting by designation
 
 
 [1]
 The remaining interest was divided between his wife, Ethel (10.264%), and his children, John (12.358%), William (12.358%), Susan (12.844%) and Nancy (11.439%)
 
 
 [2]
 The complaint also alleged a breach of fiduciary duty, violations of North Dakota and Kansas securities statutes and violations of Kansas real estate licensing statutes
 
 
 [3]
 The definitions are virtually identical. See United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 847 n.12, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); Fargo Partners v. Dain Corp., 540 F.2d 912, 914 n.3 (8th Cir. 1976)
 
 
 [4]
 There may have been some verbal representations that the agreement could be terminated on thirty days' notice. However, the management contract contained a clause stating that the written document constituted the entire agreement between the parties. See 3 Corbin, Contracts § 578 (1960)
 
 
 [5]
 The average size of the tract was 1.33 acres
 
 
 [6]
 We recognize that Schultz's allegations must be taken as true and all doubts resolved in favor of a trial on the merits. Fargo Partners v. Dain, supra at 914
 
 
 [7]
 Although the loan agreement required Viking to manage the complex for five years, the management contract was to be effective for only three years