Gregory E. and Sherrill McCONNELL, Robert L. Morey, Dennis M. Burns, Beverly McDowell and Jo Ann Giunti, Plaintiffs,

v.

FRANK HOWARD ALLEN & CO., a California corporation, et al., Defendants.

No. C–82–3349–MHP.

United States District Court, N.D. California.

Oct. 11, 1983.

Thomas J. LoSavio, Low, Ball & Lynch, San Francisco, Cal., Frank I. Mulberg, Mill Valley, Cal., for plaintiffs.

William S. Hochman, Bagshaw, Martinelli, Corrigan & Jordan, San Rafael, Cal., for Frank Howard Allen & Co.

Marshall W. Krause, Krause, Timan, Baskin, Shell & Grant, Larkspur, Cal., for Robert J. Eves, Eves Properties, Rancho Cordova Inv.

John C. MacKay, Rader, Rader & Goulart, Sacramento, Cal., for Creative Management.

Stephen A. Fraser, Sausalito, Cal., for Christine Hughes Ramberg.

M. Armon Cooper, Carol G. Perry, Lukens, St. Peter & Cooper, San Francisco, Cal., for Andrew Nickolatos.

John L. Hosack, Eugene J. Chiarelli, Tobin & Tobin, San Francisco, Cal., for 1st American Title Co. of Marin.

Stephen M. Kass, Richard G. Blair, Buchman, Kass, Morgan & Miller, Oakland, Cal., for Founders Title Co.

## MEMORANDUM DECISION AND ORDER

PATEL, District Judge.

In the instant action, plaintiffs allege fifteen separate causes of action against a variety of defendants. Two of the claims assert violations of the federal securities laws, and the rest arise out of state law. Defendants have moved under Fed.R.Civ.P. 12(b)(1) to dismiss the complaint for lack of subject matter jurisdiction, or in the alternative for summary judgment, on the ground that plaintiffs did not purchase a security within the meaning of § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), or § 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10). Defendants have also moved for summary judgment on the federal claims on the ground that these actions are barred by the applicable statutes of limitations. Having carefully considered the papers submitted and the arguments of counsel, the court grants the motion with respect to plaintiffs' § 12(2) claim, 15 U.S.C. § 77l(2), and denies the rest.

### I. *Facts*

The court need not recite the complex factual history of this case in detail. In short, agents of defendant Frank Howard Allen & Company ("FHA") began soliciting in April of 1978 for the sale of a group of eleven four-plex apartment buildings known as the "Camelot Apartments." Plaintiffs, who did not know one another at that time, all offered to purchase one or

more of the four-plexes. Although many of the plaintiffs were told that they would receive individual deeds for each four-plex purchased, when the sale finally went through in August 1978, it was structured as a joint venture, not as individual purchases. Under the agreement, for each $12,000 contributed, plaintiffs purchased a one-eleventh undivided interest in the venture. Moreover, the agreement designated defendants Andrew Nickolatos and Christine Hughes as the managing partners of the venture and granted them exclusive management authority over its operations. Plaintiffs became non-managing general partners.

At the time of the sale, defendants told the plaintiffs that they were purchasing the apartment complex from defendant Robert Eves for $759,000. They did not inform the plaintiffs that Eves had purchased the property on the same date for $620,000 from its original owners, the Keiths. Shortly after the joint venture agreement was signed, Nickolatos and Hughes informed the plaintiffs that they would have to sign another agreement because the original joint venture agreement had not been properly notarized. Plaintiffs then signed a new superseding partnership agreement which formed the Rancho Cordova Investment Company ("RC Investment I").

In early January 1979, plaintiffs received a letter from Hughes stating that the investment was in good shape and that there should not be a negative cash flow. In May 1979, however, they received a second letter from Nickolatos informing them that because the property had been refinanced there was going to be a temporary negative cash flow. All of the plaintiffs expressed dissatisfaction with the cash flow problems.

Nickolatos and Hughes arranged to resell the property back to Eves in July 1979. However, they did not inform plaintiffs of the proposed resale until November 1979, at which time they requested plaintiffs to sign a third partnership agreement, Rancho Cordova Investment Company II ("RC In-

vestment II"). This agreement was in effect a sale of the property to Eves in return for Eves' promise to pay $15,000 to plaintiffs for each $12,000 share they had purchased. Eves promised to purchase plaintiffs' interests within eighteen months after the signing of agreement. All of the plaintiffs agreed to the partnership/repurchase agreement.

Plaintiffs heard little else about their investment until January 1981, when two plaintiffs, Mr. and Mrs. McConnell, received a letter from Mr. Tacconelli. Tacconelli told them that he had purchased the property from Eves in August 1980 and that Eves had given him the McConnells' name. According to Tacconelli, Eves had told him that the plaintiffs had some interest in the property and that he would have to obtain their approval for an extension on a note due February 1, 1982. Shortly after this conversation, plaintiffs held their first investors' meeting and hired an attorney. They then began the process of unravelling what had happened to their investment. However, Hughes had moved to Oregon, and Nickolatos had disappeared. FHA and Eves refused to cooperate or answer their questions. Moreover, Eves did not honor his obligation to plaintiffs even on or after February 1, 1982, the date on which Tacconelli's note was due. Plaintiffs claim that February 1, 1982 was the date on which they discovered they had been defrauded.

## II. *Did Plaintiffs Purchase a Security?*

### A. *Subject Matter Jurisdiction*

■ Defendants have moved to dismiss this action for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1). According to defendants, plaintiffs did not purchase a security within the meaning of the Securities Acts, and therefore since the sole basis for federal jurisdiction is plaintiffs' allegation that they did purchase a security, this case must be dismissed. Under Rule 12(b)(1), the court may consider matters outside the pleadings and resolve disputed issues of fact. This is because jurisdictional facts are questions for the

court, rather than for the jury. However, it is well settled that a different rule obtains when the alleged jurisdictional basis is intertwined with an element of a federal cause of action. In such a case, the court should not determine the merits of plaintiffs' cause of action under the guise of determining jurisdictional facts. *See Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Rather, the court should assume jurisdiction and determine the merits unless "the alleged claim under the constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where such claim is wholly insubstantial and frivolous." *Id.* at 682–83, 66 S.Ct. at 776. The courts have consistently applied this rule to motions to dismiss for lack of subject matter jurisdiction in securities actions where the claim is that the plaintiff did not purchase a security. *See, e.g., Williamson v. Tucker,* 645 F.2d 404, 415–17 (5th Cir.1981). As the court's discussion of defendants' summary judgment motion will demonstrate, plaintiffs' claim that they purchased securities within the meaning of the Securities Acts is not insubstantial or frivolous, either factually or legally. Accordingly, defendants' Rule 12(b)(1) motion is denied.

### B. *Summary Judgment*

The analysis of whether an investment constitutes a security begins with *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the celebrated citrus grove case. In *Howey,* the Court set forth the test for determining when an investment is a security under § 2(1), which defines a security as, *inter alia,* an investment contract. The Court stated:

> an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests money in a common enterprise and is led to expect profits solely from the efforts of a promoter or third party.

328 U.S. at 298–99, 66 S.Ct. 1103. Subsequent cases have given a liberal reading to the requirement that the profits derive solely from the efforts of others. In *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 (9th Cir.1973), the Ninth Circuit set forth the proper standard:

> whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which effect the failure or success of the enterprise.

Although not clearly articulated in their papers, defendants raise two distinct bases for their claim that plaintiffs' investments were not securities. Their first contention is that plaintiffs' investment was not an investment contract because the nature of the efforts which it was contemplated that defendants would perform were insignificant with regard to the venture's profitability. The second challenge is to the partnership form which the investment took.

### 1. *Significance of Defendants' Efforts*

■ The question raised by defendants' motion has been relatively unexamined by the courts. This challenge goes not to the nature of the investors' role in the venture, but rather to the importance of the third parties' actions in the overall profitability of the investment. There is persuasive authority for the position that if an investor in a real estate syndicate expects profits to come solely from the general appreciation of property values, then the investment is not a security. *See Gordon v. Terry,* 684 F.2d 736, 740 n. 4 (11th Cir.1982); I L. Loss, *Securities Regulation* at 491–92 (2d Ed.1961). *See also McConathy v. Dal Mac Commercial Real Estate, Inc.,* 545 S.W.2d 871 (Tex.Civ.App.1976). In *Gordon,* the court stated:

> The District Court also ruled that profits from appreciation in land were not "profits" under *Howey's* criteria and that since appreciation was the source of profits, there could be no significant efforts of others directed to producing profits. We agreed that investments in land solely for the purpose of profits from appreciation on resale cannot be securities.

*Id.* at 740 n. 4.

Defendants contend that plaintiffs expected their profits to come solely from

appreciation in the value of the Camelot Apartments. In support of this contention, they point to the deposition testimony of several of the plaintiffs. This testimony, however, does not support defendants' position. Although several of the plaintiffs stated that they expected profits to come from appreciation, they also added that they anticipated that some profits would come from defendants' management and renovation activities. The importance of these activities should not be underestimated. Under the joint venture and partnership agreements, Nickolatos and Hughes were responsible for renovating the buildings, including painting, relandscaping and repairing the apartments, for raising and collecting rents, and for general upkeep of the property. In a real estate venture involving the sale and resale of rental properties, these activities may have a significant impact on profitability.

Furthermore, defendants had a variety of other responsibilities which also affected the profitability of the investment. Defendants were entirely responsible for negotiating the terms of the purchase and for determining the form which the investments would take. They were also responsible for the financing and refinancing of the building. Perhaps most importantly, they were expected to determine the most advantageous time for selling the property, to find a buyer and to negotiate the terms of the sale. It is clear therefore that profits depended on much more than simple appreciation in the value of the property.

It is true that plaintiffs did not specifically state in their deposition testimony that they anticipated that profits would result from these activities. However, defendants rely too heavily on plaintiffs' responses to certain deposition questions. From the court's review of the deposition testimony, it appears that all of the plaintiffs were inexperienced and uninformed about what their investment involved. They relied almost completely on the defendants and do not appear to have understood the importance of much of defendants' responsibilities. Simply because plaintiffs are unable to articulate fully the significance of defendants' activities, however, does not preclude the court from considering those activities in determining whether plaintiffs' investment is an investment contract. Under *Howey*, the court must look to the investor's expectations, but this test is not entirely subjective. If it were, the more ignorant the investor, the less likely the federal securities laws would provide him or her with protection. The court concludes, as did the court in *Gordon*, that under the undisputed facts defendants did promise significant efforts on the partnership's behalf.

### 2. *The Partnership Form*

Defendants' second contention is that the investments were not securities because they took the form of interests in a joint venture and partnership. The courts have held that an interest in a limited partnership is an investment contract. *See, e.g., SEC v. Murphy*, 626 F.2d 633, 640–41 (9th Cir.1980). In contrast, they have generally held that an interest in a joint venture or general partnership is not a security, due to the substantial rights of control retained by a general partner. Even where a general partner is passive and relies entirely on other partners to manage the partnership's assets, the courts have consistently concluded that there is no security. Nonetheless, there are exceptions to this rule. In the leading case *Williamson v. Tucker*, 645 F.2d 404, 417–26, the Fifth Circuit exhaustively reviewed the cases in this area and set forth a test for determining when a joint venture or partnership interest can be a security. According to *Williamson*,

> [a] general partnership or joint venture interest can be designated a security if the investor can establish, for example, that (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the

partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

*Id.* at 424. This test disregards form and looks to the underlying economic reality of the investment. Although an enterprise may be a partnership or a joint venture in form, it may be considered the equivalent of a limited partnership under *Williamson* because by contract or factual necessity certain partners have little or no control over the management of the enterprise.

In the instant case, it is clear that summary judgment is inappropriate under either of the first two tests. The joint venture and partnership agreements severely circumscribed plaintiffs' rights to control the enterprise. The joint venture agreement placed "sole and complete" management control in the managing partners, including the right to finance and refinance the property, to compromise claims, to improve the property, and to negotiate sales. Plaintiffs' rights were limited to approving by a 50% vote any sale or amendment to the agreement proposed by the managing partners. The partnership agreement had similar attributes. Plaintiffs could remove a managing partner, amend the agreement, terminate the partnership, or sell all assets by a 66⅔% vote. These rights are similar to those which a limited partner may exercise under California law. *See* California Corporations Code § 15507. Accordingly, under the undisputed facts, it is clear that the agreements left "so little power in the hands of the partner[s] or venturer[s] that the arrangement[s] in fact distribute[d] power as would a limited partnership." *Williamson*, 645 F.2d at 424.

Second, as noted above, plaintiffs' deposition testimony establishes that they were unsophisticated in business affairs. Many plaintiffs did not even read the documents they signed; nor did they understand the full significance of most of the transactions which occurred. Certainly there are at least disputed issues of fact as to whether plaintiffs were so inexperienced that they were "incapable of intelligently exercising [their] partnership or venture powers."

Defendants cite *Schultz v. Dain Corp.*, 568 F.2d 612 (8th Cir.1978) in support of their contentions. If anything, however, *Schultz* supports plaintiffs' position. In that case, plaintiff purchased a large apartment complex and, at the same time, executed a three-year irrevocable management contract with defendant. Defendant's responsibilities were limited to collecting rents and seeking new tenants. Although the court found that the purchase agreement coupled with the management contract did not constitute a security, it based its decision solely on the quantum of control retained by the plaintiff over the management of the property. Limiting the reach of its holding, the court specifically noted that "this is not a case where a small investor must rely on the seller's efforts because he lacks business knowledge, finances or control over the operations," and added, "Schultz had considerable business expertise." *Id.* at 616. Thus, *Schultz* implies that a different result would be appropriate in a case such as the instant one where plaintiffs do lack business expertise. Moreover, the *Schultz* court's failure to address the significance of the manager's efforts suggests that it found the efforts of the manager of an apartment complex sufficiently significant in the overall profitability of the plaintiff's investment to satisfy the *Howey* test.

Defendants also cite *De Luz Ranchos Investment, Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297 (9th Cir.1979) and *Happy Investment Group v. Lakeworld Properties, Inc.*, 396 F.Supp. 175 (N.D.Cal.1975). The court finds these cases unpersuasive. Both cases involved sales by real estate developers of parcels within large subdivisions. Plaintiffs relied on representations in defendants' promotional materials that defendants would develop the retained property. However, these promises were vague, and in fact defendants were under no contractual obligation to act on plain-

tiffs' behalf in any way. Moreover, plaintiffs' profits depended in large part on their own efforts in developing the property they had purchased. Clearly, these cases have no application to the instant action.

Accordingly, summary judgment is denied.

### III. *Statute of Limitations*

Plaintiffs purchased their interests in the original joint venture agreement in August 1978. They executed the first superseding partnership agreement in September 1978, and signed the second partnership/repurchase agreement in November 1979. Based on these transactions, they allege violations of § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and rule 10b–5 promulgated thereunder, and § 12(2) of the 1933 Act, 15 U.S.C. § 77*l*(2). They brought the instant action on July 2, 1982. Defendants have moved for summary judgment on the grounds that both the 10b–5 and § 12(2) actions are barred by the applicable statutes of limitations.

### A. *The Rule 10b–5 Claim*

█ In enacting the Securities Exchange Act of 1934, Congress failed to specify which particular statute of limitations should govern suits brought under § 10(b). The courts therefore look to state law to determine the applicable statute of limitations, *see, e.g., Turner v. Lundquist,* 377 F.2d 44, 46 (9th Cir.1967), which in California is three years under Cal.Code Civ.Proc. § 338(4). In contrast, the courts have almost uniformly held that federal, not state law, determines when the statute begins to run. *See, e.g., State of Ohio v. Peterson, Lowry, Rall, Barber & Ross,* 651 F.2d 687, 691 (10th Cir.1981); *Robertson v. Seidman & Seidman,* 609 F.2d 583, 587 (2d Cir. 1979). Citing *Turner,* defendants argue that the court must look to California law to determine when the statute begins to run. Further, they rely on *Cahill v. Ernst & Ernst,* 448 F.Supp. 84 (E.D.Wis.1978) for the proposition that when the state statute

has a date of discovery/due diligence rule, the federal tolling rule does not apply.

█ Defendants' argument is not well taken. First, although in *Turner* the Ninth Circuit looked to state law to determine when the statute begins to run, in a subsequent case, *United California Bank v. Salik,* 481 F.2d 1012, 1014 n. 7, 1015 (9th Cir.1973), the court reversed that position *sub silentio,* stating that federal policy requires that the statute applicable to rule 10b–5 actions shall not run until the fraud is, or should be, discovered. *Id.* at 1015. *See Carr v. New York Stock Exchange, Inc.,* 414 F.Supp. 1292, 1301 (N.D.Cal.1976) (noting the inconsistency between *Turner* and *Salik*). Moreover, defendants misconstrue *Cahill.* In that case, the court held that where the state statute provides more protection for a plaintiff than the federal tolling rule, the federal rule does not apply to restrict plaintiff's rights. It is not authority for the proposition that when state law provides a date of discovery/due diligence rule, federal law is inapplicable. The court will follow *Salik* here. It is the more recent Ninth Circuit pronouncement, and it accords with the uniform position of the other circuits. The court therefore concludes that federal law controls the determination of when the statute commences running.

█ The parties dispute the proper application of the federal tolling doctrine. According to plaintiff, the doctrine distinguishes between active and passive fraudulent concealment. Passive concealment occurs when the defendant commits fraud but then takes no further action to disguise the fraud from the plaintiff. In contrast, active concealment occurs when the defendant actually takes affirmative steps in addition to the original fraud to prevent plaintiff from discovering the scheme. Plaintiffs concede that when only passive concealment is alleged, the statute begins to run on the date of discovery or when in the exercise of due diligence the plaintiff should have discovered the fraud. For active concealment, however, plaintiff contends that the statute does not begin to run

until the date of actual discovery. Defendants oppose this contention, arguing that the federal tolling principle requires due diligence in all circumstances.

■ The circuits are divided on this question, and the Ninth Circuit has yet to address it. *Compare Robertson v. Seidman & Seidman,* 609 F.2d 583, 593 (2d Cir.1979) (distinguishing between active and passive concealment); *Sperry v. Barggren,* 523 F.2d 708, 711 (7th Cir.1975) (same); *Tomera v. Galt,* 511 F.2d 504, 510 (7th Cir.1975) (same); *with State of Ohio v. Peterson, Lowry, Rall, Barber & Ross,* 651 F.2d 687, 694 (10th Cir.1981) (requiring due diligence in all circumstances). The court adopts the view distinguishing between active and passive concealment for two reasons. First, this rule prevents a defendant from defrauding a plaintiff and then intentionally taking advantage of the plaintiff's naivete or laxity to cut off his or her right to redress. The instant action may well be just such a case. Second, the actual discovery rule is easier to administer because it avoids the difficult inquiry into when amidst representations, assurances and reassurances a plaintiff should have discovered the fraud.

■ In the instant action, plaintiffs have alleged, and their deposition testimony supports the contention, that defendants engaged in active concealment of their fraudulent conduct. From plaintiffs' testimony, it appears that whenever their suspicions were raised they repeatedly questioned defendants, who in turn lulled them into inaction by giving them false reassurances. Accordingly, summary judgment is clearly inappropriate. At this stage the record overwhelmingly establishes that plaintiffs did not actually discover the fraud before July 2, 1979, three years before bringing suit, and defendants do not even contest this point.

■ Furthermore, even if federal law does require due diligence, summary judgment is still inappropriate. On a motion for summary judgment the role of the court is normally quite narrow. The court

may grant summary judgment only if under the undisputed facts one party is entitled to judgment as a matter of law. However, there is conflict among the courts as to the proper role of the court in resolving summary judgment motions going to plaintiff's failure to exercise due diligence.

It is apparent that some courts have adopted a broader view of their role when due diligence is at issue. In *Peterson,* the court noted this trend, 651 F.2d at 693 and n. 13, and then traced the history of the due diligence rule to the English Chancery Court. After discussing the issue at length, it concluded that the courts do have special discretion in determining due diligence because diligence is in part an equitable question. According to the court, summary judgment is appropriate "if the documents before the court clearly and convincingly persuade the trial judge that plaintiff in the exercise of reasonable diligence would have discovered the fraud at such time as to bar the action." *Id.* at 694. Otherwise, the court concluded, diligence is a jury question. In contrast, in *Robertson,* the court adopted an opposing view. It noted that the question of due diligence, like questions of intent or good faith, is particularly inappropriate for summary judgment. "When conflicting inferences can be drawn from the facts, however, summary judgment is inappropriate." *Robertson,* 609 F.2d at 591.

The Ninth Circuit has recently clarified the law in this circuit on this question. In *Admiralty Fund v. Jones,* 677 F.2d 1289, 1294 (9th Cir.1982), the court rejected *Peterson* and reaffirmed that the strict summary judgment standard applies even when due diligence is at issue. According to the court, the question of when fraud is, or should be, discovered is for the trier of fact:

Because our precedent dictates that the question of notice of fraud is for the trier of fact, the party seeking summary disposition has an extremely difficult burden to show that there exists no issue of material fact regarding notice.

*Id.* at 1294. *See also Briskin v. Ernst & Ernst,* 589 F.2d 1363, 1368–69 (9th Cir. 1978) (trial court may not resolve conflicting inferences from the facts on motion for summary judgment). Under this strict standard, the court cannot conclude in the instant case that plaintiffs' action is untimely as a matter of law.

Defendants cite a variety of undisputed facts in support of their claim that plaintiffs should have inquired into the fraud before July 2, 1979. They point out that although plaintiffs were initially promised individual deeds, they never received them. Instead, they became joint venturers and then partners. Furthermore, even though in January 1979 defendants told plaintiffs there would be a positive cash flow, in May 1979 there was a substantial negative cash flow which was expected to last for two to three months. Also, plaintiffs were then told for the first time that the property had been refinanced. Finally, defendants were elusive in responding to plaintiffs' inquiries and refused to provide plaintiffs with information which they requested. According to defendants, these facts, and others, put plaintiffs on notice that something was wrong by at least May 1979.

However, the court concludes that conflicting inferences may be drawn from these same facts. According to plaintiffs, even though these troubling events occurred, in each instance plaintiffs questioned defendants, who in turn lulled them into trust and inaction by their reassurances. Moreover, it was not until at least January 1981 that plaintiffs had any reason to believe that their investment would not be profitable despite these problems. Accordingly, in light of the conflicting inferences which may be drawn from the underlying facts, summary judgment would be inappropriate even if due diligence were required as a matter of law. This result does not punish the unsophisticated. Rather, it allows the trier of fact to sort out on a complete record whether the plaintiffs' inaction was the result of lack of sophistication or inertia.

The cases relied upon by defendants are not to the contrary. In those cases, the defendants made specific promises to the plaintiffs about how profitable a certain investment would be. Even though shortly thereafter the investments failed disastrously and defendants' misrepresentations became apparent, plaintiffs failed to inquire into the fraud. *See, e.g., Hupp v. Gray,* 500 F.2d 993 (7th Cir.1974). In contrast, in the instant case, even if plaintiffs should have discovered that defendants had made certain misrepresentations, they had no reason to believe that their investment was sinking until well after July 1979. In *Kramas v. Security Gas & Oil, Inc.,* 672 F.2d 766 (9th Cir.1982), the Ninth Circuit did grant summary judgment against plaintiff on due diligence. Unlike the facts of this case, however, the undisputed facts in that case were so extreme as to lead to the unavoidable conclusion that plaintiff had or should have discovered the fraudulent conduct prior to the crucial date. Among other things, plaintiff had already discussed filing a lawsuit, had contacted the SEC, and had indicated a desire to retain counsel.

Accordingly, summary judgment on plaintiffs' 10b–5 claim is denied.

**B. *The § 12(2) Claim***

Section 13, 15 U.S.C. § 77m, provides the statute of limitations for the § 12(2) claim:
No action shall be maintained to enforce any liability created under section ... 12(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.... In no event shall any such action be brought to enforce a liability created under section ... [12(2)] of this title more than three years after the sale.

The parties submit conflicting authorities on whether the three year limitation is subject to an implied date of discovery/due diligence rule in accordance with the federal tolling doctrine. *Compare, e.g., In re Home-Stake Production Co. Securities Litigation,* 76 F.R.D. 337, 344–45 (N.D.

Okla.1975); *with Brick v. Dominion Mortgage & Realty Trust,* 442 F.Supp. 283, 289–91 (W.D.N.Y.1977). However, a recent Ninth Circuit opinion not cited by the parties is directly on point. In *Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1308 (9th Cir.1982), plaintiff alleged that defendant had actively concealed its fraud and argued that the three year period was therefore tolled until the date of actual discovery. Rejecting this position, the court concluded that the three year bar is absolute. *Id.*

 In the instant action, plaintiffs acquired their interests in the joint venture and first partnership agreements in August and September of 1978, well over three years before filing this suit. Consequently, their § 12(2) claims based on these transactions are clearly barred. The only transaction which falls within the three year period is the November 1979 second partnership/repurchase agreement with Eves, and plaintiffs argue that their § 12(2) claim based on this transaction still survives. This contention is without merit. The second partnership agreement was in reality the sale of the property to Eves, not the purchase" of a security by plaintiffs. Under the agreement, Eves took complete control over the property, and, in turn, promised to pay plaintiffs $15,000 for each $12,000 share within eighteen months or immediately upon resale of the property. Therefore, although structured as a partnership agreement with Eves as the managing partner, it was in fact a sale.

Moreover, even if they had purchased a security, plaintiffs' § 12(2) claim would be barred by § 13. It is undisputed that in February 1981 plaintiffs called their first investors' meeting, hired an attorney, and began the process of unravelling what had happened to their investment. It is clear therefore that they were on notice of the fraud more than one year before they brought suit.

Accordingly, plaintiffs' § 12(2) claim must be dismissed.

IT IS ORDERED that defendants' motion to dismiss for lack of subject matter jurisdiction, or in the alternative for summary judgment, on the ground that plaintiffs did not purchase a security is DENIED.

IT IS FURTHER ORDERED that defendants' motion for summary judgment on plaintiffs' rule 10b–5 claim is DENIED.

IT IS FURTHER ORDERED that defendants' motion for summary judgment on plaintiffs' § 12(2) claim is GRANTED.

IT IS FURTHER ORDERED that the discovery stay imposed in this action is DISSOLVED.